# In the United States Court of Appeals for the Fifth Circuit

TEXAS CHEMISTRY COUNCIL; AMERICAN CHEMISTRY COUNCIL; GEORGIA CHEMISTRY COUNCIL; ASBESTOS DISEASE AWARENESS ORGANIZATION; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFLCIO; OHIO CHEMISTRY TECHNOLOGY COUNCIL,

Petitioners

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent

Consolidated with No. 24-60281

AMERICAN PUBLIC HEALTH ASSOCIATION; COLLEGIUM RAMAZZINI; LOCAL F-116 (VANDENBERG PROFESSIONAL FIREFIGHTERS), INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS; LOCAL F-253 (FORT MYER PROFESSIONAL FIREFIGHTERS), INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS; THE FEELGOOD FOUNDATION; HENRY A. ANDERSON, MEDICAL DOCTOR; BRAD BLACK, MEDICAL DOCTOR; BARRY CASTLEMAN, DOCTOR OF SCIENCE; RAJA FLORES, MEDICAL DOCTOR; ARTHUR FRANK, MEDICAL DOCTOR, DOCTOR OF PHILOSOPHY; PHIL LANDRIGAN, MEDICAL DOCTOR, MASTER OF SCIENCE; RICHARD LEMEN, DOCTOR OF PHILOSOPHY, MASTER OF PUBLIC HEALTH; STEVEN MARKOWITZ, MEDICAL DOCTOR, DOCTOR OF PUBLIC HEALTH; JACQUELINE MOLINE, MEDICAL DOCTOR, MASTER OF SCIENCE; CELESTE MONFORTON, DOCTOR OF PUBLIC HEALTH, MASTER OF PUBLIC HEALTH; CHRISTINE OLIVER, MEDICAL

DOCTOR, MASTER OF PUBLIC HEALTH, MASTER OF SCIENCE; ANDREA WOLF, MEDICAL DOCTOR, MASTER OF PUBLIC HEALTH,

Petitioners

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondents

---

Consolidated with No. 24-60333

---

OLIN CORPORATION,

Petitioners

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondents

---

On Petitions for Review of Final Agency Action of the United States Environmental Protection Agency
89 Fed. Reg. 21,970 (Mar. 28, 2024)

---

**BRIEF OF INDUSTRY PETITIONERS OLIN CORPORATION, OHIO CHEMISTRY TECHNOLOGY COUNCIL, AMERICAN CHEMISTRY COUNCIL, GEORGIA CHEMISTRY COUNCIL, AND TEXAS CHEMISTRY COUNCIL**

Matthew Z. Leopold
Erica N. Peterson
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 955-1500
mleopold@HuntonAK.com
epeterson@HuntonAK.com

Elbert Lin
Hunton Andrews Kurth LLP
951 East Byrd Street, East
Tower
Richmond, VA 23219
(804) 788-8200
elin@HuntonAK.com

Nicholas D. Stellakis
Hunton Andrews Kurth LLP
60 State Street, Suite 2400
Boston, MA 02109
(617) 648-2800
nstellakis@HuntonAK.com

*Counsel for Olin Corporation*

Robert J. Karl, Esq.
Eric B. Gallon
Porter, Wright, Morris &
Arthur, L.L.P.
41 S. High Street, Suite 3000
Columbus, OH 43215
(614) 227-1925
rkarl@porterwright.com
egallon@porterwright.com

*Counsel for the Ohio
Chemistry Technology Council*

David Y. Chung
Warren Lehrenbaum
Crowell & Moring LLP
1001 Pennsylvania Ave., N.W.
Washington, DC 20004
(202) 624-2500
(202) 628-5116 (fax)
dchung@crowell.com

*Counsel for the American
Chemistry Council, Georgia
Chemistry Council, and Texas
Chemistry Council*

<u>**CERTIFICATE OF INTERESTED PERSONS**</u>

**No. 24-60193**

TEXAS CHEMISTRY COUNCIL, *et. al.*,

Petitioners

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent

---

**Consolidated with No. 24-60281**

---

AMERICAN PUBLIC HEALTH ASSOCIATION, *et al.*,

Petitioners
v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

Respondents

---

**Consolidated with No. 24-60333**

---

OLIN CORPORATION,

Petitioner

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

Respondents

i

The undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. **Parties**

   a. **Petitioners**:

      i. TEXAS CHEMISTRY COUNCIL

      ii. AMERICAN CHEMISTRY COUNCIL

      iii. GEORGIA CHEMISTRY COUNCIL

      iv. ASBESTOS DISEASE AWARENESS ORGANIZATION

      v. UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO

      vi. OHIO CHEMISTRY TECHNOLOGY COUNCIL

      vii. AMERICAN PUBLIC HEALTH ASSOCIATION

      viii. COLLEGIUM RAMAZZINI

      ix. LOCAL F-116 (VANDENBERG PROFESSIONAL FIREFIGHTERS), INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS

      x. LOCAL F-253 (FORT MYER PROFESSIONAL FIREFIGHTERS), INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS

      xi. THE FEELGOOD FOUNDATION

      xii. HENRY A. ANDERSON, MEDICAL DOCTOR

      xiii. BRAD BLACK, MEDICAL DOCTOR

xiv.    BARRY CASTLEMAN, DOCTOR OF SCIENCE

xv.    RAJA FLORES, MEDICAL DOCTOR

xvi.    ARTHUR FRANK, MEDICAL DOCTOR, DOCTOR OF PHILOSOPHY

xvii.    PHIL LANDRIGAN, MEDICAL DOCTOR, MASTER OF SCIENCE

xviii.    RICHARD LEMEN, DOCTOR OF PHILOSOPHY, MASTER OF PUBLIC HEALTH

xix.    STEVEN MARKOWITZ, MEDICAL DOCTOR, DOCTOR OF PUBLIC HEALTH

xx.    JACQUELINE MOLINE, MEDICAL DOCTOR, MASTER OF SCIENCE

xxi.    CELESTE MONFORTON, DOCTOR OF PUBLIC HEALTH, MASTER OF PUBLIC HEALTH

xxii.    CHRISTINE OLIVER, MEDICAL DOCTOR, MASTER OF PUBLIC HEALTH, MASTER OF SCIENCE

xxiii.    ANDREA WOLF, MEDICAL DOCTOR, MASTER OF PUBLIC HEALTH

xxiv.    OLIN CORPORATION

b. **Respondents**:

i.    UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

ii.    MICHAEL REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

2. **Attorneys**

a. **For Petitioner Olin Corporation**: Hunton Andrews Kurth LLP: Elbert Lin, Matthew Z. Leopold, Erica N. Peterson, Nicholas D. Stellakis

b. **For Petitioner/Intervenor Ohio Chemistry Technology Council**: <u>Porter, Wright, Morris & Arthur, L.L.P.</u>: Robert J. Karl, Eric B. Gallon

c. **For Petitioner/Intervenor Texas Chemistry Council**: <u>Baker Botts, L.L.P.</u>: Aaron M. Steett, Christopher B. Carter

d. **For Petitioners/Intervenors American Chemistry Council and Georgia Chemistry Counsel**: <u>Crowell & Moring LLP</u>: David Y. Chung, Warren Lehrenbaum

e. **For Petitioner/Intervenor United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO**: <u>OSH Law Project, L.L.C.</u>: Randy Sue Rabinowitz, Victoria Louise Bor; <u>Motley Rice, L.L.C.</u>: Nathan David Finch

f. **For Petitioner/Intervenor Asbestos Disease Awareness Organization:** <u>Lexington Law Group, LLP</u>: Lucas Williams; <u>Sussman and Associates</u>: Robert Matthew Sussman

g. **For Petitioners/Intervenors American Public Health Association; Collegium Ramazzini; Local F-116 (Vandenberg Professional Firefighters), International Association of Fire Fighters; Local F-253 (Fort Myer Professional Firefighters), International Association of Fire Fighters; The FeelGood Foundation; Henry A. Anderson, Medical Doctor; Brad Black, Medical Doctor; Barry Castleman, Doctor of Science; Raja Flores, Medical Doctor; Arthur Frank, Medical Doctor, Doctor of Philosophy; Phil Landrigan, Medical Doctor, Master of Science; Richard Lemen, Doctor of Philosophy, Master of Public Health; Steven Markowitz, Medical Doctor, Doctor of Public Health; Jacqueline Moline, Medical Doctor, Master of Science; Celeste Monforton, Doctor of Public Health, Master of Public Health; Christine Oliver, Medical Doctor, Master of Public Health, Master of Science; Andrea Wolf, Medical Doctor, Master of Public Health:** <u>Lexington Law Group, LLP</u>: Lucas Williams

h. **For Respondent United States Environmental Protection Agency:** <u>U.S. Department of Justice, Environment & Natural Resources Division</u>: Laura J. Glickman; <u>EPA Office of General Counsel</u>: Jeffrey Prieto

iv

### 3. **Other**

a. Interested Non-Parties: Importers, processors, and industrial users of chrysotile asbestos, including members of Petitioners American Chemistry Council, Georgia Chemistry Council, Ohio Chemistry Technology Council, and Texas Chemistry Council.

/s/ *Elbert Lin*

Elbert Lin
*Counsel for Petitioner Olin Corporation*

**STATEMENT REGARDING ORAL ARGUMENT**

This case presents important and novel questions regarding the interpretation of the Toxic Substances Control Act ("TSCA") in the context of the decision of the Environmental Protection Agency ("EPA") to ban chrysotile asbestos in the chlor-alkali and chemical-production industries and whether EPA violated TSCA by failing to refer regulation of chrysotile asbestos in the workplace to the Occupational Safety and Health Administration. It also presents a question about the constitutionality of TSCA's delegation to EPA of authority to apply different rules to different companies.[1] Oral argument would assist the Court.

---

[1] Ohio Chemistry Technology Council, American Chemistry Council, Georgia Chemistry Council, and Texas Chemistry Council (collectively, "Industry Associations") do not join this argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................... i

STATEMENT REGARDING ORAL ARGUMENT ........................................... vi

TABLE OF CONTENTS ................................................................................. vii

TABLE OF AUTHORITIES .............................................................................. x

JURISDICTIONAL STATEMENT ........................................................................ 1

STATEMENT OF ISSUES ................................................................................. 1

INTRODUCTION ........................................................................................... 2

STATEMENT OF THE CASE ............................................................................. 7

   I.    The chlor-alkali and chemical industries use chrysotile asbestos in
compliance with OSHA regulations, including proper use of PPE, when
handling it. ........................................................................................ 7

       A.    The chlor-alkali and chemical industries operate under OSHA's
comprehensive Asbestos Standard. .................................................. 9

       B.    Asbestos diaphragms are fabricated under a tightly controlled
process. ......................................................................................... 12

       C.    Use of asbestos-containing sheet gaskets in the chemical industry is
well-controlled. ............................................................................. 16

  II.    Congress established TSCA's risk-evaluation and risk-management
program as gap-filling authority to mitigate unreasonable risk to health or
the environment. .............................................................................. 17

       A.    TSCA section 6 imposes a two-step process: risk evaluation and
risk management. ........................................................................... 18

       B.    TSCA section 9 ensures that other federal agencies with authority
can act before any action taken by EPA. ......................................... 22

       C.    TSCA's legislative history underscores that it was and remains a
gap-filling statute. ......................................................................... 24

 III.    This Court vacated EPA's previous attempt to use TSCA to ban other uses
of asbestos. ..................................................................................... 28

 IV.    In 2020, EPA conducted a risk evaluation and finds that PPE eliminates
unreasonable risk under the chlor-alkali condition of use. ................. 29

       A.    EPA evaluated six different conditions of use. ................................ 29

B.     EPA found unreasonable risk from the chlor-alkali use by artificially assuming no PPE is used. .............................................30

C.     EPA did not find unreasonable risk from the asbestos brakes in NASA's Super Guppy Turbine aircraft...........................................34

V.     EPA completed its risk management and issued the Final Rule in 2024. ..35

A.     EPA's proposed rule banned asbestos after two years or, alternatively, five years. ................................................................35

B.     EPA issued the Final Rule in March 2024. ....................................37

C.     These petitions are filed. ................................................................40

SUMMARY OF ARGUMENT ..............................................................................40

STANDARD OF REVIEW ....................................................................................42

ARGUMENT ..........................................................................................................43

I.     EPA's risk evaluation of asbestos diaphragms and sheet gaskets is not based on substantial evidence but worst-case assumptions that overestimate risk. .......................................................................................43

A.     EPA made incorrect assumptions about the use of PPE in the chlor-alkali industry. ....................................................................45

B.     EPA improperly based its unreasonable-risk determination on the high-end tendency. .......................................................................47

C.     EPA incorrectly assumed 16-year-olds are exposed to asbestos for 40 years.........................................................................................49

D.     EPA made incorrect assumptions about ONUs..............................50

II.     EPA violated TSCA section 9 by failing to refer its findings to OSHA. ...54

A.     The OSH Act is "a Federal law not administered by" EPA that "may" prevent or reduce the unreasonable risk that EPA identified. .................................................................................................56

B.     EPA's reasons for not making the referral misapply the section 9(a) standard.........................................................................................58

III.    The Final Rule for asbestos diaphragms in the chlor-alkali industry and sheet gaskets in chemical production exceeds EPA's authority under TSCA section 6. ........................................................................................62

A.     The Final Rule violates section 6 by imposing measures beyond "the extent necessary" to eliminate unreasonable risk...................63

B.  EPA did not consider any real alternative regulatory action............68

IV.  EPA's setting of different compliance deadlines is unlawful. ....................70

A.  TSCA section 6(d)(2) is an unconstitutional delegation of legislative authority. .........................................................................70

B.  EPA's differential treatment of companies in the chlor-alkali industry does not comply with the statute. ......................................72

CONCLUSION .........................................................................................................75

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Ausimont U.S.A. Inc. v. EPA*,
838 F.2d 93 (3d Cir. 1988) ................................................................43

*Babb v. Wilkie*,
589 US. 399 (2020) ...........................................................................64

*Callaway v. Cent. Sur. & Ins. Corp.*,
107 F.2d 761 (5th Cir. 1939) .............................................................74

*Chem. Mfrs. Ass'n v. EPA*,
859 F.2d 977 (D.C. Cir. 1988) ..........................................................43

*Chem. Mfrs. Ass'n v. EPA*,
899 F.2d 344 (5th Cir. 1990) .............................................................43

*Consumers' Rsch. v. FCC*,
109 F.4th 743 (5th Cir. 2024) ...........................................................72

*Corrosion Proof Fittings v. EPA*,
947 F.2d 1201 (5th Cir. 1991) ..............................3, 28, 29, 42, 44, 48

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ...........................................................................58

*Env't Def. Fund, Inc. v. EPA*,
636 F.2d 1267 (D.C. Cir. 1980) ........................................................43

*Facebook, Inc. v. Duguid*,
592 U.S. 395 (2021) ...........................................................................64

*Gundy v. United States*,
588 U.S. 128 (2019) ...........................................................................72

*High Sierra Hikers Ass'n v. Blackwell*,
390 F.3d 630 (9th Cir. 2004) .............................................................64

*HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*,
594 U.S. 382 (2021) ...........................................................................63

*INS v. Chadha*,
    462 U.S. 919 (1983) ........................................................................71

*Jalbert as Tr. of the F2 Liquidating Tr. v. Zurich Servs. Corp.*,
    953 F.3d 143 (1st Cir. 2020) .........................................................56

*Jarkesy v. SEC*,
    144 S. Ct. 2117 (2024) .............................................................71, 72

*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022) ....................................................71, 72

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020) ........................................................................64

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024) .............................................................56, 64

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..........................................................................1

*Mach Mining, LLC v. EEOC*,
    575 U.S. 480 (2015) ........................................................................57

*Mississippi v. Richardson*,
    622 F.2d 1203 (5th Cir. 1987) .......................................................74

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..........................................................................43

*Shell Chem. Co. v. EPA*,
    826 F.2d 295 (5th Cir. 1987) .........................................................43

*United States v. Anderson Seafoods, Inc.*,
    622 F.2d 157 (5th Cir. 1980) .........................................................56

*Walter O. Boswell Mem'l Hosp. v. Heckler*,
    749 F.2d 788 (D.C. Cir. 1984) .......................................................68

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
    586 U.S. 9 (2018) .....................................................................57, 58

**Statutes**

15 U.S.C. § 2601 ...................................................................17

15 U.S.C. § 2602 ...............................................................19, 44

15 U.S.C. § 2605 ......... 1, 3, 18, 19, 20, 21, 22, 28, 44, 48, 61, 63, 65, 68, 69, 70, 73

15 U.S.C. § 2608 ..............................22, 23, 24, 27, 54, 56, 58, 62

15 U.S.C. § 2618 ............................................................1, 40, 42

15 U.S.C. § 2625 ...................................................................53

28 U.S.C. § 2112 ...............................................................1, 40

29 U.S.C. § 654 ................................................................55, 57

Pub. L. No. 94-469, 90 Stat. 2003 ...............26, 27, 29, 62, 63, 64, 65, 69

Pub. L. No. 114-182, 130 Stat. 448 ...................................27, 65

**Other Authorities**

20 C.F.R. § 1910.134(c) ...........................................................11

29 C.F.R. § 1910.2(d) .............................................................51

29 C.F.R. § 1910.134(a)(2) ........................................................11

29 C.F.R. § 1910.134(b) ...........................................................31

29 C.F.R. § 1910.1001 .................. 9, 10, 11, 12, 46, 51, 52, 55, 57, 67, 68

29 C.F.R. § 1926.1101 .............................................................17

40 C.F.R. § 23.5(a) ................................................................1

40 C.F.R. § 702.33 (2017) .........................................................53

36 Fed. Reg. 10,466 (May 29, 1971) ...............................................9

50 Fed. Reg. 27,674 (July 5, 1985) .............................................55, 62

50 Fed. Reg. 41,393 (Oct. 10, 1985) ............................................55, 62

54 Fed. Reg. 29,460 (July 12, 1989)......................................28, 69

82 Fed. Reg. 31,592 (July 7, 2017)..........................................29

82 Fed. Reg. 33,726 (July 20, 2017).........................................18

83 Fed. Reg. 26,998 (June 11, 2018) ........................................30

87 Fed. Reg. 21,706 (Apr. 12, 2022) .........................35, 45, 47, 61

89 Fed. Reg. 21,970 (Mar. 28, 2024)
............. 1, 5, 7, 8, 9, 37, 38, 39, 40, 41, 50, 55, 59, 60, 61, 63, 67, 69, 70, 73, 74

89 Fed. Reg. 37,028, 37,035 (May 3, 2024) ...........................44

H. Rep. 114-176 (2015) ....................................................28

S. Rep. No. 94-698 (1976) .............................................25, 26

S. Rep. No. 114-67 (2015) .............................................65, 66

Statement of the President on Signing S. 3149 into Law, 12 Weekly
    Comp. Pres Doc. 1489 (Oct. 12, 1976)..............................26

*Toxic Substances Control Act Oversight: Hearings Before the
    Subcomm. on Toxic Substances and Environmental Oversight of
    the S. Comm. on Environment and Public Works*, 98th Cong. 50,
    276 (1983) ...............................................................26

Black's Law Dictionary (12th ed. 2024) ................................56

Webster's Third New International Dictionary 1510 (1986) ..................64

# JURISDICTIONAL STATEMENT

This is a challenge to a final rule of the Environmental Protection Agency ("EPA") titled Asbestos Part 1; Chrysotile Asbestos; Regulation of Certain Conditions of Use Under the Toxic Substances Control Act (TSCA), 89 Fed. Reg. 21,970 (Mar. 28, 2024) ("Final Rule"). This Court has jurisdiction over the petitions for review pursuant to 15 U.S.C. § 2618(a)(1)(A), 28 U.S.C. § 2112(a), and the May 7, 2024, Consolidation Order of the United States Judicial Panel on Multidistrict Litigation (ECF No. 14). Each of the petitions was timely filed within 60 days of the date that the Final Rule was promulgated for purposes of judicial review, April 11, 2024. 15 U.S.C. §§ 2605(i)(2), 2618(a); 40 C.F.R. § 23.5(a). The petitions arise from final agency action under 15 U.S.C. § 2605(i).

Each Industry Petitioner filed in a Circuit Court in which it, or its members, transact business that is directly affected by the Final Rule. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–52 (1992) ("[T]here is ordinarily little question" that a directly regulated entity has standing to "challeng[e] the legality of government action or inaction.").

# STATEMENT OF ISSUES

1.      Whether EPA's Risk Evaluation, on which the Final Rule is premised, fails the substantial evidence standard because it is based on worst-case assumptions and not actual conditions of use, thereby overestimating risk.

1

2.　　　Whether the Final Rule exceeds EPA's authority under section 9 of the Toxic Substances Control Act and is not supported by substantial evidence because EPA failed to refer its findings to the Occupational Safety and Health Administration, the agency that has primary responsibility over workplace safety, and did not provide an adequate explanation for failing to do so.

3.　　　Whether the Final Rule exceeds EPA's authority under section 6 of the Toxic Substances Control Act because it imposes measures beyond "the extent necessary" and because EPA did not consider any real alternative regulatory action other than a ban.

4.　　　Whether the Toxic Substances Control Act's authority for EPA to set different compliance deadlines is an unconstitutional delegation of authority and, if not, whether EPA's differential treatment by setting different compliance deadlines for different companies is not based on substantial evidence.[2]

## INTRODUCTION

In this risk-management rulemaking under the Toxic Substances Control Act ("TSCA"), EPA has banned chrysotile asbestos in the chlor-alkali and chemical-production industries, among other uses. But TSCA allows EPA to regulate only "to

---

[2] Ohio Chemistry Technology Council, American Chemistry Council, Georgia Chemistry Council, and Texas Chemistry Council (collectively "Industry Associations") join all portions of this brief with the exception of the second sentence of the Statement Regarding Oral Argument, Statement of Issues No. 4, Section V(b)(2) of the Statement of the Case, and Section IV of the Argument.

the extent necessary" to eliminate *unreasonable risk*. 15 U.S.C. § 2605(a). EPA erred by imposing a ban notwithstanding its own determination that unreasonable risk can be managed, and in fact eliminated, by measures less than a ban—specifically, ensuring that exposures to chrysotile asbestos remain at or below a number known as the "Existing Chemical Exposure Limit" or "ECEL" (described in detail below). Along the way, EPA also failed to implement best available science and improperly sidestepped its obligation to submit a report to the Occupational Safety and Health Administration ("OSHA"), the agency with primary authority to regulate workplace safety, as required by TSCA section 9.

The Final Rule at issue in these proceedings is EPA's *second* attempt to ban asbestos under TSCA, 15 U.S.C. §§ 2601 et seq. Its first attempt to ban most forms of asbestos was rejected by tis Court because of procedural and substantive defects in EPA's rulemaking proceedings. *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201 (5th Cir. 1991), *opinion clarified* (Nov. 15, 1991). Now, emboldened by 2016 amendments to TSCA, EPA tries once more. This time EPA focuses on certain uses of chrysotile asbestos, a type of asbestos with curled and flexible fibers, rather than the needle-like fibers of other asbestos types. Chrysotile fibers are used in industrial and commercial applications, including in diaphragms in the chlor-alkali industry and in sheet gaskets in chemical production.

EPA reads the 2016 amendments to effect an exponential expansion of its authority. Under the guise of those amendments, EPA claims the power to ban a substance whether or not other means are equally effective at reducing risk. And in doing so, it usurps the regulatory authority of sister agencies that have the primary and express authority to regulate—and that in fact do regulate—the exact risks EPA wants to target. This Court should and must rein in this arrogation of authority.

TSCA, as enacted *and* as amended, constrains EPA's ability to regulate. The statute was and remains a gap-filling law, expressly designed and intended to permit regulation of *unreasonable* risks that would otherwise escape such control. Contrary to EPA's suggestion, the 2016 amendments do not grant EPA broad authority to regulate simply because a chemical presents a hazard under contrived and unrealistic circumstances. Instead, those amendments reinforced TSCA's original purpose by limiting EPA to regulating only "unreasonable risk" of specific real-world uses of a chemical, and requiring EPA to consider how other agencies and the industry are managing that risk. And even when there is a void for EPA to fill, the agency may only regulate that unreasonable risk "to the extent necessary" to eliminate it. Congress did not grant EPA unrestrained power to regulate as the agency sees fit. EPA's broad action here against asbestos diaphragms in the chlor-alkali industry and asbestos-containing sheet gaskets in chemical production ignores these congressional constraints.

No one doubts that airborne asbestos particles can present a human-health hazard. Petitioners here are challenging only the unnecessary ban of particular uses in the workplace—including a use that is essential for manufacturing one-third of our nation's supply of chlorine, which is essential to clean our clothes, treat our water supply, and disinfect surfaces in health care and food-preparation areas, among other necessary uses. The asbestos diaphragms in the chlor-alkali industry and asbestos-containing sheet gaskets in chemical production are used only in the workplace, under extensive federal regulation by OSHA and under tightly controlled conditions. In this way, the asbestos used by chlor-alkali companies and chemical manufacturers is no different from myriad other chemicals that can be hazardous to human health but are safely handled and used for important and beneficial purposes under conditions that neutralize the hazard and mitigate any unreasonable risk. TSCA does not allow, and Congress did not grant, EPA the authority it has asserted in the Final Rule.

The Final Rule should be vacated and the matter remanded to EPA for the following reasons.

*First*, EPA's threshold finding that chrysotile asbestos used in the chlor-alkali and chemical industries presents an unreasonable risk was not supported by substantial evidence.

*Second*, even if EPA correctly identified unreasonable risk, EPA exceeded its authority under TSCA section 9 because it failed to defer to OSHA, which EPA itself has recognized has "primary" authority to regulate workplace safety. OSHA has robust existing regulations governing asbestos in the chlor-alkali and chemical industries and broad statutory authority to further regulate asbestos. TSCA section 9 required EPA to send a report to OSHA for that agency to first assess whether additional regulation is needed to mitigate the unreasonable risk EPA perceives. EPA did not provide an acceptable explanation for refusing to do so.

*Third*, EPA also exceeded its authority under TSCA section 6. Even assuming an unreasonable risk and that EPA acted properly in failing to defer to OSHA, EPA overstepped by regulating beyond what was necessary to eliminate unreasonable risk. It also failed to consider any meaningfully different alternative to the ban it proposed.

*Fourth*, EPA afforded different compliance deadlines to different companies in the chlor-alkali industry. That is unlawful in all events for two reasons.[3] For starters, the provision that authorizes the differential treatment is so vague that it constitutes an unconstitutional delegation of legislative authority. In addition, EPA's proffered basis for the differential treatment fails the substantial evidence standard.

---

[3] As noted, Industry Associations do not join this argument. *Supra* at 2, n.2.

# STATEMENT OF THE CASE

## I. The chlor-alkali and chemical industries use chrysotile asbestos in compliance with OSHA regulations, including proper use of PPE, when handling it.

The chlor-alkali industry uses chrysotile asbestos in diaphragms to produce chlorine and sodium hydroxide (caustic soda). 89 Fed. Reg. at 21,975. Chlorine is a component of essential products, including disinfectants, 88% of US-produced pharmaceuticals, sterile packaging, and electronics. Toxic Substances Control Act (TSCA) Science Advisory Committee on Chemicals Review of Risk Evaluation for Asbestos, EPA-HQ-OPPT-2019-0501-0072 ("2019 SACC Review"), Chlorine Institute Comment (June 2, 2020) ("6/2/2020 CI Comment"), JA__; TSCA Section 6 Risk Management for Asbestos, Part 1: Chrysotile Asbestos ("2021 Part 1"), EPA-HQ-OPPT-2021-0057-0261, Products of the Chlorine Tree (May 12, 2022), JA__. Caustic soda is an essential component of products used for water disinfection and treatment and an essential component of a host of other goods and processes. 2021 Part 1, EPA-HQ-OPPT-2021-0057-0261, Products of the Sodium Hydroxide Tree (May 12, 2022), JA__.

The chlor-alkali process uses electricity to separate sodium and chlorine molecules in salt water. *Id*. When the salt water is passed through an electric current, chlorine, sodium hydroxide, and hydrogen are formed. *Id*. The reaction occurs in an "electrolytic cell," one with a compartment with an anode and a compartment with

a cathode. Asbestos; TSCA Review and Risk Evaluation, EPA-HQ-OPPT-2016-0736-0052, American Chemistry Council Comment, Enclosure B (Mar. 15, 2017), JA__. A chrysotile asbestos diaphragm separates the two compartments:



*Id*. Using asbestos diaphragms is effective because the asbestos is chemically inert. 89 Fed. Reg. at 21,975. In the United States, three companies own a total of eight chlor-alkali facilities that use asbestos-containing diaphragms. *Id*. at § 21,971. Some of these facilities make diaphragms on-site from asbestos, while others receive fabricated diaphragms from other chlor-alkali facilities and send them back when a diaphragm reaches the end of its life. EPA (2020) Risk Evaluation for Asbestos Part

I: Chrysotile Asbestos, EPA-HQ-OPPT-2021-0057-0661, EPA-740-R1-8012 ("Risk Eval.") at 75, JA__.

The chemical manufacturing industry uses gaskets containing chrysotile asbestos to provide durable seals and prevent equipment leaks under extreme operating conditions, such as high temperatures (e.g., greater than 1,850°F), high pressures, and the presence of chlorine or other corrosive substances. Risk Eval. at 93, JA__. Such extreme conditions are found in many chemical manufacturing and processing operations, where chrysotile asbestos–containing sheet gaskets help to assure process safety and integrity. 89 Fed. Reg. at 21,976. Such operations include the manufacture of titanium dioxide and chlorinated hydrocarbons; polymerization reactions involving chlorinated monomers; and steam cracking at petrochemical facilities. *See id.*

### A. The chlor-alkali and chemical industries operate under OSHA's comprehensive Asbestos Standard.

OSHA has regulated occupational exposure to asbestos for 53 years under the Occupational Safety and Health Act ("OSH Act"). *See* 36 Fed. Reg. 10,466 (May 29, 1971). OSHA imposes a robust regulatory regime that limits exposure, requires engineering and other controls, and requires appropriate respirators.

For starters, OSHA has implemented a Permissible Exposure Limit ("PEL"). 29 C.F.R. § 1910.1001(c). Employers must ensure that no employee is exposed to an airborne concentration of asbestos greater than 0.1 fibers/cubic centimeter of air

("f/cc") (determined as an eight-hour time-weighted average). *Id*. § 1910.1001(c)(1). This is complemented by an "excursion limit," essentially a way to regulate any spike in exposure over that eight-hour timeframe. In addition to the eight-hour limit, employees must not be exposed to a concentration greater than 1.0 f/cc in a 30-minute period. *Id*. § 1910.1001(c)(2).

So that no employee is exposed to a concentration of asbestos greater than the PEL, OSHA mandates a hierarchy of controls. *Id*. § 1910.1001(f)(1). The first line of defense that OSHA mandates comprises engineering controls and work practices "to reduce and maintain employee exposure" to below the PEL. *Id*. § 1910.1001(f)(1)(i). These include using "wet methods" where asbestos is handled in a wet state so that airborne fibers are below the PEL, and local exhaust ventilation to collect dust in accordance with a specified standard. *Id*. § 1001(f)(1)(iv) & (f)(1)(vi). The controls and practices also include enclosure or confinement of the operation. *Id*. § 1910.134(a)(1).

Next are respirators. Respirators are required when the engineering and workplace controls are not sufficient to reduce concentrations below the PEL, but they may also be used in conjunction with engineering and workplace controls to reduce exposure to the lowest levels achievable. *Id*. § 1910.1001(f)(1)(ii). In addition, respirators are required for "regulated areas," i.e., restricted-access areas

demarcated by employers where airborne concentrations of asbestos exceed the PEL. *Id*. § 1910.1001(e).

Respirator selection and training is also highly regulated. Respirator selection is governed by 29 C.F.R. § 1910.134(a)(2). *See* 29 C.F.R. § 1910.1001(g)(2)(i) (incorporating § 1910.134). Among other things, all respirators must be certified by the National Institute for Occupational Safety and Health ("NIOSH"). *Id*. § 1910.134(d). Furthermore, each employer must implement a written respiratory protection program maintained by a trained program administrator. 20 C.F.R. § 1910.134(c). The program must be maintained by a trained program administrator. *Id*. The program must include procedures for selecting respirators, medical evaluations of employees required to use respirators, fit-testing procedures, procedures for proper respirator use, procedures for storing, maintaining, and discarding respirators, training of employees in the proper use of respirators, and procedures for evaluating the effectiveness of the program. *Id*. § 1910.134(c)(1).

OSHA imposes other requirements beyond engineering controls and respiratory protection. Employees exposed to asbestos above the PEL must be provided, without cost, protective clothing and clean change rooms and shower rooms. *Id*. § 1910.1001(h) and (i). Employees in the regulated areas are not permitted to eat, drink, chew gum, or apply cosmetics. *Id*. Employers "shall institute

a medical surveillance program" for employees exposed to asbestos above the PEL. *Id*. § 1910.1001(*l*) (detailing requirements of the medical-surveillance program).

OSHA also regulates the means of exposure monitoring, requiring that determinations of employee exposure be made from breathing-zone air samples representative of the eight-hour and 30-minute exposures. *Id*. § 1910.1001(d)(1). Monitoring must comply with specific procedures. *Id*. § 1910.1001(d)(6) & App'x A. And samples must be evaluated using the OSHA Reference Method. *Id*. § 1910.1001(d)(6).

## B.    Asbestos diaphragms are fabricated under a tightly controlled process.

The chlor-alkali industry adheres to and exceeds OSHA's requirements. To begin, there is robust monitoring. Each facility measures full-shift and short-term exposure for employees that are in "similar exposure groups" (groups that are based on the similarity and frequency of the task performed, the materials used, and the processes and controls in place). 6/2/2020 CI Comment at 7–8, JA__.

In addition, whenever dry asbestos is present, workers wear respiratory PPE. *Id*. All employees who may be exposed to asbestos above the PEL receive training on (among other things), relevant engineering controls and work practices, procedures to protect against exposure to asbestos, the proper use of respiratory PPE, and, of course, the dangers of asbestos. 2019 SACC Review; 6/2/2020 CI Comment at 2–4, JA__; Asbestos – TSCA Review and Scoping, EPA-HQ-OPPT-2016-0736-

0052, ACC Chlorine Panel Comments (Mar. 15, 2017) at 2–3 & encl. A, B, & C, JA__; 2021 Part 1, EPA-HQ-OPPT-2021-0057-0398, ACC Chlorine Panel Comments (July 13, 2022) at 40–43 ("7/13/2022 ACC Comment"); Asbestos – TSCA Review and Scoping, EPA-HQ-OPPT-2016-0736-0106, ACC Supp. Comments (Sept. 19, 2017) ("9/19/2017 ACC Comment") at 2–5, JA__; EPA-HQ-OPPT-2016-0736-0106, Att. 1 - ACC Comments (May 12, 2017) ("5/12/2017 ACC Comment") at 1–3 & Att. 1, JA__; The Chlorine Institute, Pamphlet 137 - Guidelines: Asbestos Handling for the Chlor – Alkali Industry, Edition 7 (Mar. 2016) at 21–22 ("Pamphlet 137"), JA__ (CONFIDENTIAL).[4]

More specifically, great care is taken in the shipping and receiving of asbestos. Raw asbestos is shipped to chlor-alkali facilities in sealed bags in shipping containers. Risk Eval. at 76, JA __. On arrival, the sealed bags are inspected for leaks and, if any are found, the area is controlled to prevent accidental exposure, the bags are repaired, and the location is barricaded and treated as an area in need of cleanup. *Id.* Workers involved in this activity wear PPE and use respiratory protection, and workers not involved in cleanup are prohibited from entering the area. *Id.* Any loose

---

[4] Pamphlet 137 is published by The Chlorine Institute, reflects the industry's best practices, and is highly regarded. 6/2/2020 CI Comment at 2, JA__. The chlor-alkali industry adheres to its requirements. 9/19/2017 ACC Comment at 2, JA__; 5/12/2017 ACC Comment at 1, JA__.

asbestos is collected using HEPA-filtered[5] vacuum cleaners or wetted with water (which renders the fibers non-friable, meaning they are not reduced to powder form to travel through the air) and cleaned up before any further unloading can proceed. *Id.*

The process of fabricating the diaphragm cells also occurs under tightly controlled conditions. Sealed bags of chrysotile asbestos are opened, and the asbestos is transferred to a mixing tank. *Id.* At some plants, this process is fully automated and enclosed, while at others the process takes place via gloveboxes (sealed containers with gloves built into the side walls so that workers can manipulate objects while preventing any exposure from occurring). *Id.* EPA noted that at facilities that use gloveboxes, workers typically wear Powered Air Purifying Respirators, gloves, and disposable particulate suits when transferring materials to the glovebox. *Id.* at 79, JA__. Once in the mixing tank, the raw chrysotile asbestos is blended with a liquid solution of weak caustic soda and salt to create a slurry. *Id.* at 76, JA__. Preparing the slurry involves closed processes and wet methods, which minimize airborne exposure potential. And since this is a wet process, workers typically wear gloves, boots, and disposable particulate suits. *Id.* at 79, JA__.

---

[5] HEPA-filtered stands for "high efficiency particulate air" filtered.

14

The slurry is deposited onto a metallic screen or perforated plate to form the diaphragm, using a vacuum to evenly apply the slurry across the screen or plate. *Id.* at 77, JA__. The diaphragm is then drained and placed in an oven to dry and harden the asbestos. *Id.* While forming the diaphragms, workers typically wear gloves and boots with disposable particulate suits. *Id.* at 79, JA__. The asbestos then fuses to the screen or plate, eliminating the exposure potential. *Id.* at 77, 79, JA__, __. After cooling, the diaphragm is installed in the electrolytic cell. *Id.* at 77, JA__. The cell typically lasts for one to three years before replacement. *Id.* at 78, JA__.

Some facilities recondition used diaphragms. *Id.* at 79, JA__. The cells are disassembled and then hydroblasted to remove the asbestos coating. *Id.* During the disassembly process, workers typically wear impermeable gloves, boots, goggles, and disposable particulate suits. *Id.* For hydroblasting, workers wear a supplied air-respirator hood, a waterproof suit, impermeable gloves, and boots. *Id.* at 80, JA__. Wastewater from hydroblasting is filtered to remove asbestos before being discharged from the facility by workers wearing impermeable gloves, boots, and disposable particulate suits. *Id.* EPA also notes that workers disposing of remaining wastes, such as the filters from hydroblasting, wear PPE, including respirators, and wet solid waste before double-bagging the waste, sealing it, and placing it in containers for transfer to an asbestos landfill. *Id.*

Throughout all this, facilities verify, through monitoring, that every task with exposure potential is conducted in a proper manner. ACC Comment to SAC on Chemicals on the Draft Risk Evaluation for Asbestos, EPA-HQ-OPPT-2019-0501-0070 (June 2, 2020) at 7–8 ("6/2/2020 ACC Comment"), JA__. They also measure the diligence and efficacy of the workplace controls. *Id.*

### C. Use of asbestos-containing sheet gaskets in the chemical industry is well-controlled.

Asbestos-containing gaskets were widely used decades ago in chemical manufacturing facilities to form leakproof seals between fixed components. While asbestos-free gaskets are now available and widely used, asbestos-containing gaskets remain the material of choice for industrial applications where gasket material is exposed to extreme conditions (e.g., high pressure, high temperature, hazardous chemical operations). Risk Eval. at 85, JA__. Typically, for this condition of use, the sheet gasket is totally enclosed within the manufacturing equipment, thus minimizing the possibility of exposure. 7/13/22 ACC Comment at 13, JA__.

As of July 2022, the chemical industry has largely adopted policies and practices of replacing asbestos gaskets with non-asbestos gaskets on an ongoing basis, in the ordinary course of operations, meaning that they are replaced as they wear out or degrade. *Id.* But asbestos-containing gaskets continue to be the only product proven capable of withstanding certain extreme operating conditions and

thus, provide a greater degree of process safety and integrity during chemical manufacturing and processing. Risk Eval. at 93–94, JA__.

Workers in the chemical industry receive training on replacing asbestos-containing gaskets. Trained maintenance workers wear leather gloves when handling new gaskets for insertion into process equipment, and they wear respirator protection—either an airline respirator or a cartridge respirator with HEPA filters—when removing old gaskets for replacement. Additionally, facilities utilizing these gaskets follow the OSHA Asbestos Standard, 29 C.F.R. § 1926.1101.

## II. Congress established TSCA's risk-evaluation and risk-management program as gap-filling authority to mitigate unreasonable risk to health or the environment.

Enacted in 1976 and amended most recently in 2016, TSCA provides EPA limited authority "to regulate chemical substances and mixtures which present an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2601. The statute is not an unrestricted license to regulate all perceived chemical hazards anywhere. Instead, as evidenced by TSCA's plain text and legislative history, Congress gave EPA gap-filling authority to address only unreasonable risks to health and the environment from a particular condition of use that might otherwise go unregulated because such risks fall within the interstices of other regulatory authority.

### A. TSCA section 6 imposes a two-step process: risk evaluation and risk management.

TSCA section 6, as last amended in 2016, directs EPA through a two-step process to regulate conditions of using a chemical substance that present an unreasonable risk of injury. 15 U.S.C. § 2605. The first step is risk evaluation, and the second is risk management.

#### 1. Risk evaluation considers the real-world applications of the chemical.

The first step requires EPA to evaluate whether a use of a chemical substance presents an unreasonable risk of injury to health or the environment without consideration of costs or non-risk factors. 15 U.S.C. § 2605(b)(4)(A). This means that EPA does not evaluate the "hazards" of a substance in a vacuum but the *risk* the substance presents. E.g., *id*. § 2605(b)(1)(A). "Hazards" are the "adverse health or environmental effects . . . that can be caused by exposure to the chemical substance in question." 82 Fed. Reg. 33,726, 33,741 (July 20, 2017). Risk, in contrast, refers to the likelihood that a chemical substance will result in harm. *See* EPA, Integrated Risk Information System Glossary (last updated May 23, 2024) ("Risk (in the context of human health): The probability of adverse effects resulting from exposure to an environmental agent or mixture of agents.").[6] Thus, risk is a product of the hazards associated with a substance and the degree to which an individual is exposed

---

[6] Available at https://www.epa.gov/iris/iris-glossary#r.

to the substance. Congress did not define *unreasonable* risk in the statute, nor did EPA provide a definition.

The statute further requires EPA to evaluate risk not in the abstract but under the circumstances the substance is actually used—i.e., "conditions of use." The Administrator is directed to "conduct risk evaluations . . . to determine whether a chemical substance presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors . . . under the conditions of use." *Id.* § 2605(b)(4)(A). Likewise, in "publish[ing] the scope of the risk evaluation," EPA must identify "the hazards, exposures, conditions of use, and the potentially exposed or susceptible subpopulations [EPA] expects to consider." 15 U.S.C. § 2605(b)(4)(D).[7]

The term "conditions of use" means "the circumstances . . . under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." *Id.* § 2602(4). Thus, in conducting a risk evaluation, EPA must consider available information on hazards and exposures for the conditions of use, including information relevant to specific

---

[7] A "potentially exposed or susceptible subpopulation" is "a group of individuals within the general population identified by [EPA] who, due to either greater susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure to a chemical substance or mixture, such as infants, children, pregnant women, workers, or the elderly." 15 U.S.C. § 2602(12).

risks of injury to health or the environment and potentially exposed or susceptible subpopulations. *Id.* § 2605(b)(4)(F). EPA must also take into account "the likely duration, intensity, frequency, and number of exposures under the conditions of use of the chemical substance" and "describe the weight of the scientific evidence for the identified hazard and exposure." *Id.*

EPA's risk-evaluation determination cannot immediately be challenged in court because it is not a final agency action. But it can be challenged when a risk management rule—like the Final Rule here—is promulgated. 15 U.S.C. § 2605(i).

> **2.** **Risk management considers a host of factors and permits regulation only "to the extent necessary" to eliminate the unreasonable risk.**

If EPA finds that conditions of using a chemical substance present an unreasonable risk of injury to health or the environment, it moves on to risk management. 15 U.S.C. § 2605(a). For this second step, Congress placed even more constraints on EPA beyond those applicable to the risk-evaluation process.

To begin, risk management requires EPA to consider costs, among other factors. 15 U.S.C. § 2605(c)(2). EPA must consider the magnitude of the exposure of humans and the environment to the chemical substance and the benefits of the chemical substance for various uses. *Id.* In addition, EPA must consider the economic consequences and cost effectiveness of any proposed rule, including the

likely effect on the national economy, small businesses, technological innovation, the environment, and public health. *Id.*

As for the actual regulatory measure, Congress limited the actions EPA can take. Congress did not grant EPA general discretion, but rather provided EPA with a specific and exclusive set menu of regulatory approaches. *Id*. The available measures are: (1) prohibiting or otherwise restricting the manufacture, processing, or distribution of the substance or limiting the amount of the substance that can be manufactured, processed, or distributed; (2) prohibiting or otherwise restricting the manufacture, processing, or distribution of the substance for a particular use or use in excess of a certain concentration; (3) requiring clear warnings or instructions on the substance; (4) imposing record or testing requirements; (5) prohibiting or regulating a manner of use of the substance; (6) prohibiting or regulating the disposal of the substance; and (7) requiring notice of the determination to the public or affected persons. *Id.* Critically, EPA may only apply such measures "*to the extent necessary* so that the chemical substance or mixture no longer presents such risk." *Id*. (emphasis added).

Congress also required EPA to consider options other than the action EPA proposes to take. *Id*. § 2605(c)(2)(A)(iv). These are termed "primary alternative regulatory options." *Id*. EPA must evaluate the costs, benefits, and cost effectiveness of at least one alternative to the approach it ultimately proposes in rulemaking. *Id*.

The risk-management measures EPA selects must take effect "as soon as practicable, but not later than 5 years after the date of promulgation of the rule" except with respect to a ban or phase-out, which must begin (though need not be completed) "as soon as practicable, but not later than 5 years after the date of promulgation." *Id.* § 2605(d)(1). The effective date must also "provide for a reasonable transition period." *Id.* The statute provides, without any guidance, that the effective date of EPA's regulatory requirements "may vary for different affected persons." *Id.* § 2605(d)(2).

## B. TSCA section 9 ensures that other federal agencies with authority can act before any action taken by EPA.

Consistent with the statute's purpose as a gap-filling statute, TSCA section 9 requires EPA to defer to other relevant agencies, or use other laws, before it takes action under TSCA section 6 on any unreasonable risk from a chemical's condition of use.

### 1. Section 9(a) requires EPA to report to another agency when unreasonable risk "may be" reduced by a law EPA does not administer.

Section 9(a) requires EPA to send a report to another agency when an unreasonable risk from a condition of use "may be prevented or reduced to a sufficient extent" by action under a federal law that EPA does not administer. 15 U.S.C. § 2608(a)(1). The reporting requirement is triggered if EPA both finds unreasonable risk of injury in its risk-evaluation phase and determines, "in [EPA's]

discretion, that such risk may be prevented or reduced to a sufficient extent by action taken under a Federal law not administered by [EPA]." *Id*. In those circumstances, "[EPA] *shall* submit to the agency which administers such law a report which describes such risk and includes in such description a specification of the activity or combination of activities which [EPA] has reason to believe so presents such risk." *Id*. (emphasis added).

The report not only conveys information, but also seeks action and a response from the other agency. The report must include a "detailed statement of the information on which it is based and shall be published in the Federal Register." *Id*. Furthermore, the report must ask the other agency to (1) determine whether the identified risk "may be prevented or reduced to a sufficient extent by action taken under such law"; (2) "issue an order declaring whether or not the activity or combination of activities specified in the description of such risk presents such risk" if the agency determines "that such risk may be so prevented or reduced"; and (3) respond to EPA. *Id*.

The other agency then has the baton. EPA can go no further if the other agency either (1) determines that there is no unreasonable risk or (2) initiates action to protect against such risk. 15 U.S.C. § 2608(a)(2). EPA can only move forward if the other agency does nothing within the applicable timeframe. *Id*. § 2608(4).

## 2. Sections 9(b) and 9(d) impose other similar limitations.

The remainder of Section 9 imposes additional hurdles on EPA's exercise of TSCA regulatory authority.

Section 9(b) requires EPA to forgo TSCA rulemaking when adequate action could be taken under *other* laws that EPA administers—or to explain why the public interest requires using TSCA. 15 U.S.C. § 2608(b)(1). And due to a 2016 amendment, EPA is required in making any such explanation to consider the relative costs and efficiencies of regulating under TSCA rather than some other statutory authority. *Id*. § 2608(b)(2).

Separately, Section 9(d) requires EPA to "consult and coordinate" with all other agencies and instrumentalities of the federal government to impose "the least burdens of duplicative requirements on those subject to the chapter." 15 U.S.C. § 2608(d).

## C. TSCA's legislative history underscores that it was and remains a gap-filling statute.

The statute's legislative history—both at enactment and at the time of the 2016 amendments—confirms what TSCA's plain text shows: TSCA is designed to supplement, not supplant, other laws that address chemical risks.

### 1. The legislative history at enactment describes TSCA as intended to fill regulatory gaps.

Congress intended TSCA to fill gaps where regulatory programs under other statutes—those administered by EPA *and* those administered by other agencies—lacked such authority. S. Rep. No. 94-698, at 1, 5, 13 (1976). TSCA "is designed to fill a number of regulatory gaps which currently exist." *Id*. at 1; *id*. at 5 (TSCA "would close a number of major regulatory gaps"); Cong. Rec. 25,432 (July 23, 1973) (TSCA gives "EPA authority to control chemical hazards which may not be satisfactorily controlled under other Federal laws."); Cong. Rec. 19,162 (May 30, 1972) (explaining that TSCA was designed to fill "gaps exist in our regulatory framework").

One such gap was the lack of premarket review of new chemicals (i.e., scrutiny before first manufacture). S. Rep. No. 94-698 at 1. For existing chemicals, Congress expressly noted that "other authorities," including the OSH Act, regulated "ambient air standards for the workplace," and this regulation "will in many cases be sufficient to adequately protect health and the environment." *Id*. at 1–2. Congress therefore mandated that EPA carefully coordinate and consult with other agencies and itself to ensure that TSCA was used no more than to fill regulatory gaps.

> If an unreasonable risk may be prevented or reduced sufficiently by other Federal laws, [EPA] *must* request the agency administering the law to issue an order declaring whether or not such a risk is presented. If the agency agrees that such risk is presented, it must determine if the

> risk can be prevented or reduced to a sufficient extent by action taken under the law administered by it.

*Id*. at 8–9 (emphasis added); *see also* Statement of the President on Signing S. 3149 into Law, 12 Weekly Comp. Pres Doc. 1489 (Oct. 12, 1976) (noting TSCA "closes a gap in our current array of laws" and that "[i]t is critical . . . that the legislation be administered in a manner so as not to duplicate existing regulatory and enforcement authorities").

In the years that followed the enactment of TSCA, a number of government officials also recognized TSCA's gap-filling purpose. *See, e.g.*, *Toxic Substances Control Act Oversight: Hearings Before the Subcomm. on Toxic Substances and Environmental Oversight of the S. Comm. on Environment and Public Works*, 98th Cong. 50, 276 (1983) (statement of Sen. Dave Durenberger, Chairman, S. Subcomm. On Toxic Substances and Env't Oversight) (referring to TSCA as a "gap filler" to be used when other federal laws are insufficient to manage chemical pollution).

## 2. The legislative history of the 2016 amendments confirms that the statute remains a gap-filling law.

As noted above, Congress updated TSCA in 2016 with significant amendments designed to reinforce and bolster its gap-filling purpose. The Frank R. Lautenberg Chemical Safety for the 21st Century Act of 2016 ("Lautenberg Act") made a number of changes to TSCA, including amendments to section 6(a). The original language of section 6(a) imposed a requirement of narrow tailoring (that

EPA regulate "to the extent necessary") *and* a least-burden requirement (that EPA use the "least burdensome requirements"). Pub. L. No. 94-469, § 6(a), 90 Stat. 2003 (requiring EPA to regulate "to the extent necessary to protect adequately against such risk using the least burdensome requirements"). In 2016, Congress eliminated the least-burden requirement but retained the requirement of narrow tailoring. Pub. L. No. 114-182, 130 Stat. 448 (requiring EPA to regulate unreasonable risk "to the extent necessary so that the chemical substance or mixture no longer presents such risk").

At the same time, Congress granted EPA more options to choose from in regulating "to the extent necessary." Specifically, it gave options other than outright "prohibiting" the manufacturing, processing, or distribution of a substance. Pub. L. No. 94-469 §§ 6(a)(1) and 6(a)(2). The Lautenberg Act added express additional authority to take less draconian action and "otherwise restrict[]" the substance, removing any doubt that regulation less than a ban is permitted.

Similarly, as already discussed, the Lautenberg Act amended section 9 in a way that reinforced the presumption that EPA should favor other laws that it administers instead of regulating under TSCA. To overcome that presumption, EPA must not only explain why regulating under TSCA is in the public interest, but it must consider and explain how the relative costs and efficiencies support doing so. *Id*. § 2608(b)(2).

The legislative history describes these changes as "reinforc[ing] TSCA's original purpose of filling gaps in Federal law that otherwise did not protect against the unreasonable risks presented by chemicals." H. Rep. 114-176, at 28 (2015). Congress believed that EPA "should respect the experience of, and defer to other agencies that have relevant responsibility . . . ." *Id*. at 28–29. Congress did "not intend for the implementation of TSCA to conflict with or disregard [OSHA's] hierarchy of controls." *Id*. at 29.

## III.  This Court vacated EPA's previous attempt to use TSCA to ban other uses of asbestos.

In 1989, EPA issued a final rule prohibiting the manufacture, importation, processing, and distribution in commerce of most asbestos-containing products. Asbestos; Manufacture, Importation, Processing, and Distribution in Commerce Prohibitions, 54 Fed. Reg. 29,460 (July 12, 1989). That ban was to take effect in three stages, depending upon the toxicity of the substance and how soon adequate substitutes would be available. *Id.* Significantly, the ban did not include asbestos-containing diaphragms in the chlor-alkali industry or specialty asbestos-containing gaskets such as those used in the chemical industry because EPA concluded that they did not present an unreasonable risk. *Id.* at 29,500–02.

This Court vacated the 1989 rule. This Court's decision rested in part on the requirement (removed by the 2016 amendments) that EPA use the "least burdensome requirements." *Corrosion Proof Fittings*, 947 F.2d at 1214–15 (quoting 15 U.S.C.

§ 2605(a) (1991)). Bu the Court relied as well on language Congress did *not* alter. For example, this Court criticized EPA's reliance on unquantified benefits. EPA failed to compute the costs and benefits of its proposed rule past the year 2000. *Id*. at 1218. EPA nevertheless sought to justify the rule in part by these unquantified benefits. *Id*. at 1219. This Court rejected that effort. Doing so "not only lessen[ed] the value of the EPA's cost analysis, but also ma[de] any meaningful judicial review impossible." *Id*. EPA impermissibly used unquantified benefits "as a trump card allowing the EPA to justify any cost calculus, no matter how high." *Id*.

Moreover, this Court observed that "Congress did not enact TSCA a zero-risk statute" in reliance on language that largely remains intact. As noted above, TSCA Section 6(a), relied on by this Court, still authorizes EPA to regulate only "unreasonable" risk, not just any risk. And any regulation is still permitted only "to the extent necessary so that the substance no longer presents such [unreasonable] risk." *Corrosion Proof Fittings*, 947 F.2d at 1214–15.

## IV.  In 2020, EPA conducted a risk evaluation and finds that PPE eliminates unreasonable risk under the chlor-alkali condition of use.

### A.  EPA evaluated six different conditions of use.

In July 2017, EPA published a scoping rule for its risk evaluation for chrysotile asbestos. 82 Fed. Reg. 31,592 (July 7, 2017). After receiving public comment, EPA issued a "problem formulation" the next year, refining the scope of risk evaluation

and describing how EPA would evaluate the risks from asbestos. 83 Fed. Reg. 26,998 (June 11, 2018). In March 2020, EPA released its draft risk evaluation, and finalized it in December 2020. Risk Eval., JA___.

Ultimately, EPA considered six different conditions of use: (1) chlor-alkali diaphragms; (2) sheet gaskets in chemical production facilities; (3) other gaskets; (4) oilfield brake blocks; (5) aftermarket automotive brakes/linings; and (6) other vehicle friction products. *Id.* EPA determined *separately* for each of the conditions of use it reviewed whether chrysotile asbestos presented an unreasonable risk. To do so, EPA evaluated inhalation exposures to workers and occupational non-users ("ONUs") using monitoring data from the industry and from literature. *Id*. at 24, JA___. According to EPA, ONUs are employees who do not use or handle asbestos but may work in the same building. Risk Eval. at 71, JA___.

## B. EPA found unreasonable risk from the chlor-alkali use by artificially assuming no PPE is used.

For the chlor-alkali condition of use, EPA's analysis shows *no* unreasonable risk when workers use PPE. *Id.* at 202, JA___. EPA set a benchmark of $1\times10^{-4}$ (that is, any number greater than one case of cancer per 10,000 people is considered unreasonable risk). The agency found no risk above that benchmark *when workers use PPE*, as reflected in the cells highlighted in yellow below:

**Table 4-40. Summary of Risk Estimates for Inhalation Exposures to Workers and ONUs by COU**

| COU | Population | Exposure Duration and Level | Cancer Risk Estimates (before applying PPE) | Cancer Risk Estimates (with APF=10[c]) | Cancer Risk Estimates (with APF=25[c]) |
|---|---|---|---|---|---|
| Diaphragms for chlor-alkali industry Section 4.2.2.1. | Worker | Central Tendency (8-hr) | 9.9 E-5 | 9.9 E-6 | 3.9 E-6 |
| | | High-end (8-hr) | 6.8 E-4 | 6.8 E-5 | 2.7 E-5 |
| | | Central Tendency short term | 1.2 E-4 9.4 E-5[a] | 1.0 E-5[d] | 4.9 E-6[b] |
| | | High-end short term | 1.3 E-3 6.7 E-4[a] | 9.0 E-5[d] | 5.1 E-5[b] |
| | ONU | Central Tendency (8-hr) | 5.0 E-5 | N/A | N/A |
| | | High-end (8-hr) | 1.6 E-4 | N/A | N/A |

*Id.* (yellow highlighting added).[8] EPA made similar findings for use of asbestos sheet gaskets. *Id.*

But in the Risk Evaluation, EPA focused on the column with pink highlighting, which shows unreasonable risk under some metrics *if workers use no PPE*. To support this approach, EPA divided the asbestos-related tasks chlor-alkali workers perform into eight categories: (1) asbestos unloading and handling, (2) glovebox weighing and asbestos handling, (3) creating asbestos slurry, (4) depositing the slurry on the slide, (5) cell assembly, (6) cell disassembly, (7) filter press, and (8) hydroblasting. *Id.* at 83, Table 2-7, JA__. EPA determined that workers use respirators for three of these tasks (asbestos unloading and transport, glovebox weighing and asbestos handling, and hydroblasting) but not for five tasks (creating asbestos slurry, depositing the slurry on the slide, cell assembly, cell disassembly,

---

[8] "APF" means "Assigned Protection Factors," the level of respiratory protection a respirator or class of respirators is expected to provide. 29 C.F.R. § 1910.134(b). The higher the number, the greater the protection.

and filter press). *Id.* at 236, JA__. Simply because some workers do not use respirators all of the time, EPA determined it was reasonable to look at exposure data for all workers assuming no use of PPE.[9]

EPA also looked at the worker exposure data for the "high-end tendency," rather than "central tendency." "High-end tendency" is the risk estimate at the 95th percentile, meaning that it is based on the measurements of asbestos exposures data that fall at highest end. Put another way, 95% of the measured asbestos levels are *below* the data used to calculate the "high-end tendency" risk estimate. Risk Eval. at 72, 82, JA__, __.

Notably, EPA expressly relied on spurious data. EPA looked at 58 short-term area air samples for workers taken over 16 years. *Id.* at 82, Table 2-4, JA__. One of those samples showed 11 f/cc, far, far above any other sample. *Id.* This was obviously an erroneous reading—which EPA notes was reported as an "atypical result." *Id.* Indeed, EPA noted that, on re-sampling, the reading was more than 500 times *lower*, at 0.019 f/cc. *Id.* EPA nevertheless, without explanation, included and relied on this aberrant reading to find unreasonable risk. *Id.* at 84, Table 2-8; 185, Table 4-5; and 202, Table 4-40, JA__, __, __.

---

[9] EPA found no unreasonable risk from the distribution in commerce upstream of the chlor-alkali facilities or from handling diaphragms after they are fabricated. Risk Eval. at 233–34, JA__.

In addition to finding unreasonable risk to workers without PPE, EPA also found unreasonable risk to non-workers—i.e., ONUs. EPA based this finding on questionable data: (1) its estimate (about which EPA admitted it had low certainty) that there are 2,900 to 3,000 ONUs at chlor-alkali facilities and (2) 15 area air samples for which asbestos fibers, if any, were all below the level of detection. Risk Eval. at 83, 223–24, JA__, JA__–__. EPA's estimate of the number of ONUs was calculated by simply taking the total number of all employees at all chlor-alkali plant complexes and subtracting out the number of workers who work directly with asbestos, without any regard for the actual circumstances of the ONUs' jobs, including whether the supposed ONU works in an entirely different building. *Id*. at 223, JA__. EPA itself admits its number is merely an "upper bound estimate" because the real number is "unknown." *Id*.

What is more, although EPA assumed that ONUs use no respirators or other PPE, some actually *do* use respirators. For example, any janitorial-like activities in the asbestos-processing areas, as well as maintenance and repair activities, are performed using respirators and other required PPE in compliance with site procedures and the OSHA Asbestos Standard. 7/13/2022 ACC Comment at 26, JA__. By counting "maintenance and janitorial staff" (who *do* use PPE) as ONUs who EPA assumed do *not* use PPE, EPA further overestimated the number of persons exposed to asbestos in the workplace without PPE. Risk Eval. at 83, 223, JA__, __.

Regarding the 15 ONU air samples on which EPA relied in its risk evaluation, all of these were "non-detects," showing no asbestos present. *Id*. at 83, JA__. EPA nevertheless assumed that there *must have been* asbestos present, just below the level of detection for the collection method. *Id*. EPA then proceeded to create its own figures for the level of asbestos present by taking the "detection limit," meaning the lowest concentration of asbestos the method could measure), and dividing that number by two (for the central estimate) or simply using the detection limit (for the high-end estimate). *Id*.[10]

Finally, EPA found no risk from the chlor-alkali use to consumers or bystanders. *Id*. at 243, JA__. That is because asbestos diaphragms are used *only* in the workplace.

### C.  EPA did not find unreasonable risk from the asbestos brakes in NASA's Super Guppy Turbine aircraft.

Unlike the chlor-alkali use, EPA did not find unreasonable risk from the asbestos brakes in NASA's Super Guppy Turbine aircraft. *Id.* at 114, 234, JA__, __. NASA uses many of the same controls as are used in the chlor-alkali industry, with one notable exception: *No respirators are used to handle the asbestos in the Super*

---

[10] As EPA explained, it "replac[ed] the observation with the limit of detection (LOD) divided by two. Therefore, for deriving exposure estimates, the 15 area samples were assigned numerical values of 0.002 f/cc [N=11] and 0.004 f/cc [N=4]. The central tendency ONU concentration used in EPA's analysis was 0.0025 f/cc (i.e., the arithmetic mean of the 15 data points), and the high end ONU concentration used in EPA's analysis was <0.008 f/cc." Risk Eval. at 83, JA__.

*Guppy*. Technicians working on Super Guppy brake replacement receive annual training about asbestos health hazards, work practices to reduce generation of airborne asbestos dust, and use of PPE to reduce asbestos exposure. *Id.* at 116, JA__. Work occurs in a ventilated walk-in booth, meaning that asbestos fibers likely are not released into the general workspace. *Id.* Workers implement wet methods to mitigate asbestos release. *Id.* at 115, JA__. Waste dusts are collected using a high-efficiency particulate air vacuum, and all asbestos-containing wastes are double-bagged and disposed of according to asbestos waste-management regulations. *Id.* Despite the complete absence of respirators, EPA found these controls caused the asbestos brakes *not* to pose an unreasonable risk. *Id.* at 116, JA__. As such, NASA was subjected to no regulation under the Final Rule.

## V.   EPA completed its risk management and issued the Final Rule in 2024.

### A.   EPA's proposed rule banned asbestos after two years or, alternatively, five years.

In 2022, EPA moved on to the second step and issued its risk-management proposal for notice and comment. 87 Fed. Reg. 21,706 (Apr. 12, 2022). EPA proposed to ban the manufacture (including import), processing, distribution in commerce, and commercial use of chrysotile asbestos containing diaphragms used in the chlor-alkali industry and asbestos-containing sheet gaskets used in chemical

production. *Id.* at 21,720. The ban would not take effect, however, until two years after the rule's effective date. *Id.*

The primary alternative regulatory action that EPA considered was a ban taking effect five years after the effective date. This alternative would require an interim measure before the ban—compliance with a risk-based performance standard called an existing chemicals exposure limit ("ECEL") to reduce inhalation exposures by workers and ONUs. *Id.* at 21,722. The ECEL was set at 0.005 f/cc, calculated as an eight-hour time-weighted average. EPA determined that if inhalation exposures are kept below the ECEL, a person likely to be exposed in the workplace would be protected against an excess risk of cancer above the $1{\times}10^{-4}$ benchmark. *Id.* at 21,723; Collin Beachum, Existing Chemical Exposure Limit (ECEL) for Occupational Use of Chrysotile Asbestos. Memo to Erik Winchester (June 8, 2021), EPA-HQ-OPPT-2021-0057-0017, at 1, JA__ (EPA "determined, as a matter of risk management policy" that ensuring that exposures to chrysotile asbestos remains at or below a number known as the ECEL "will eliminate the unreasonable risk"). In its proposal, EPA stated that it expected industry would be able to implement the ECEL through an industrial-hygiene program that implemented engineering and workplace controls. *Id.* EPA also proposed an "ECEL-action level" of one half the ECEL; measurements of fibers above this more stringent level would trigger additional monitoring. *Id*.

EPA sought comment on various aspects of its proposal, including data on the feasibility of requiring compliance with an ECEL before the effective date of the proposed ban. *Id.* at 21,726. EPA also asked for comment on what would be an appropriate compliance date for the ban on diaphragms and sheet gaskets that would be "as soon as practicable" and "provide for a reasonable transition period." *Id.* All of the Industry Petitioners joining this brief filed comments on EPA's proposed rule. *See* 2021 Part 1, EPA-HQ-OPPT-2021-0057-0248, Olin Comments (Apr. 4, 2023), JA__; *Id.*, EPA-HQ-OPPT-2021-0057-0405, ACC Chlorine Panel Comments (July 13, 2022), JA__; *Id.*, EPA-HQ-OPPT-2021-0057-0402, ACC Comments (July 13, 2022), JA__; *Id.*, EPA-HQ-OPPT-2021-0057-0336, Chamber Coalition Comments (July 8, 2022), JA__.

## B. EPA issued the Final Rule in March 2024.

EPA promulgated the Final Rule on March 28, 2024, with an effective date of May 28, 2024. 89 Fed. Reg. 21,970.

### 1. The Final Rule bans chrysotile asbestos, with a phase-out period.

As of the effective date, the Final Rule bans the manufacture (including import) of chrysotile asbestos for diaphragms in the chlor-alkali industry and sheet gaskets used in chemical production. *Id.* at 22,006–07. The Final Rule then sets timelines for a ban on the processing, distribution, and use of chrysotile asbestos for diaphragms in the chlor-alkali industry that differ based on whether a facility is

converting to non-asbestos diaphragms or non-asbestos membrane technology. *Id.* at 22,006–07. This means that while new asbestos diaphragms cannot be made, already produced or installed diaphragms may continue to be used during a phase-out period.

For asbestos-containing sheet gaskets used in chemical production, the Final Rule generally bans the manufacture (including import), processing, distribution in commerce, and commercial use of chrysotile asbestos, including any chrysotile asbestos containing products or articles beginning two years after the effective date as EPA originally proposed. *See id.* at 22,007. Any sheet gaskets that are already installed for use on May 27, 2026, however, are not subject to the distribution in commerce and commercial-use prohibitions. *Id.* The Final Rule allows for commercial use of asbestos-containing sheet gaskets for titanium dioxide production until five years after the effective date, but the ban on manufacture, processing, and distribution must cease by two years after the effective date. *See id.*

### 2. The phase-out period differs as applied to different chlor-alkali facilities.

The phase-out period differs based on the technology to which facilities are converting—non-asbestos diaphragms or non-asbestos membranes. Facilities converting to non-asbestos diaphragms have five years from the effective date to complete the transition. *Id.* There are five such facilities—two owned by Olin Corporation, two owned by OxyChem, and one owned by Westlake. *Id.* Facilities

converting to non-asbestos membrane technology (three facilities owned by OxyChem) get more time. *Id.* For those facilities, the first conversion must be completed in five years, the second in eight years, and the third in 12 years. *Id.* EPA explains that it is providing more time for conversions to non-asbestos membrane technology because these are more complicated than conversions to non-asbestos diaphragms and have to take place one facility at a time. *Id.* at 21,980.

### 3. The Final Rule requires compliance with the ECEL as an interim measure.

The Final Rule also requires compliance with the ECEL of 0.005 f/cc (as an eight-hour time-weighted average) on an interim basis before the ban on use of asbestos diaphragms takes effect. *Id.* at 22,008. And there are numerous mandates in furtherance of that compliance. Companies must monitor exposure, the required frequency of which may increase if any sample exceeds the ECEL. *Id.* Companies must demarcate and limit access to areas where airborne concentrations may exceed, or have the reasonable possibility of exceeding, the ECEL. Those authorized to enter such areas must be provided respirators. *Id.* at 22,008–09. Companies must also have an exposure plan to reduce exposures to or below the ECEL through engineering controls, work practices, and by use of respirators whenever the ECEL is exceeded or is expected to be exceeded. *Id.* at 22,009. Respiratory protection, when required, must be provided according to requirements set forth in the Rule regarding fit,

training, and other requirements. *Id.* Finally, companies must institute a training program for any potentially exposed person. *Id.* at 22,010.

The Final Rule imposes the same pre-ban, interim requirements for the commercial use of chrysotile asbestos sheet gaskets for titanium dioxide production as those applicable to asbestos diaphragms in the chlor-alkali industry. *See id.* at 22,008–10.

### C.    These petitions are filed.

In April and June 2024, Petitioners filed petitions for review of the Final Rule in various circuit courts around the country under 15 U.S.C. § 2618. Those petitions were transferred to this Court by the Judicial Panel on Multidistrict Litigation under 28 U.S.C. § 2112 and consolidated.

### SUMMARY OF ARGUMENT

The Final Rule should be vacated and remanded for four overarching reasons.

*First*, the Final Rule is premised on an erroneous risk evaluation. EPA's risk evaluation of the use of asbestos in diaphragms in the chlor-alkali industry and in sheet gaskets for chemical production is not based on substantial evidence. EPA made inaccurate, worst-case assumptions about the chlor-alkali and chemical-production industries and about exposure data. The agency's assumptions do not reflect the circumstances under which diaphragms are used and therefore overestimate risk.

*Second*, even if EPA was correct in concluding that asbestos diaphragms and sheet gaskets present unreasonable risk in the chlor-alkali and chemical-production contexts, respectively (and EPA was not correct), the Final Rule violates TSCA because it flouted statutory requirements that require EPA to defer to other agencies and invoke TSCA authority only if necessary. Since the OSH Act was signed in 1970, OSHA has been the primary federal agency to regulate safety and health standards for workers. In fact, OSHA has long exercised regulatory power over the use of asbestos diaphragms and gaskets in the workplace, yet EPA failed to submit a report to OSHA under TSCA section 9. Although EPA has some discretion, its stated reasons for not submitting the report clearly exceed that discretion. EPA claims that it is "better positioned" to regulate than OSHA because OSHA can only regulate the workplace. This makes no sense for two reasons: (1) the standard is not whether EPA is better positioned but whether OSHA "may" eliminate unreasonable risk and (2) asbestos diaphragms and sheet gaskets are used *only* in the workplace.

*Third*, even assuming EPA correctly found unreasonable risk and complied with TSCA section 9, the Final Rule exceeds EPA's authority under TSCA section 6 for several reasons. For starters, the Final Rule regulates beyond "the extent necessary" to eliminate unreasonable risk from chrysotile asbestos in the chlor-alkali and chemical-production contexts. The plain text and legislative history of section 6 show that EPA must tailor its regulation, but EPA did not do so. It banned asbestos

diaphragms and sheet gaskets even though under its own reasoning, there are measures short of a ban, such as applying the ECEL, mandating PPE, and continued use of other workplace controls, that would eliminate the unreasonable risk. In addition, EPA independently violated section 6 by failing to consider a real alternative regulatory action. EPA's consideration of different effective dates for the *same* regulatory action is not sufficient.

*Fourth*, in all events, EPA's decision to set different compliance deadlines for different regulated entities is unlawful. TSCA section 6(d)(2), which allows EPA to set different compliance deadlines for different entities, is an unconstitutional standardless delegation of legislative authority. Separately, EPA's reasons for differential treatment reveal its decision fails the substantial evidence standard.[11]

## STANDARD OF REVIEW

The TSCA "substantial evidence" standard "requires (1) that the agency's decision be based upon the entire record, taking into account whatever in the record detracts from the weight of the agency's decision; and (2) that the agency's decision be what 'a reasonable mind might accept as adequate to support [its] conclusion.'" *Corrosion Proof Fittings*, 947 F.2d at 1213; *see* 15 U.S.C. § 2618(c)(1)(B)(i) ("the court shall hold unlawful and set aside such rule if the court finds that the rule is not

---

[11] As noted, the Industry Associations do not join this argument. *Supra* at 2, n.2.

supported by substantial evidence in the rulemaking record taken as a whole"). EPA must "'cogently explain why it has exercised its discretion in a given manner' and 'must offer a rational connection between the facts found and the choice made.'" *Chem. Mfrs. Ass'n v. EPA*, 899 F.2d 344, 359 (5th Cir. 1990) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48, 52 (1983)).

This standard, which was unchanged by the 2016 amendments, is "more searching" than the APA's arbitrary and capricious standard and "particularly 'demanding'" for the agency to meet. *Chem. Mfrs. Ass'n v. EPA*, 859 F.2d 977, 992 (D.C. Cir. 1988) (quoting *Ausimont U.S.A. Inc. v. EPA*, 838 F.2d 93, 96 (3d Cir. 1988)); *Env't Def. Fund, Inc. v. EPA*, 636 F.2d 1267, 1277 (D.C. Cir. 1980) (substantial-evidence standard "more rigorous than the arbitrary and capricious standard"). Put another way, the substantial-evidence standard is "less deferential" to the agency than the arbitrary and capricious standard. *Shell Chem. Co. v. EPA*, 826 F.2d 295, 297 (5th Cir. 1987).

## ARGUMENT

**I.    EPA's risk evaluation of asbestos diaphragms and sheet gaskets is not based on substantial evidence but worst-case assumptions that overestimate risk.**

In the risk evaluation on which the Final Rule is premised, EPA's determination that asbestos diaphragms in the chlor-alkali industry and sheet gaskets in chemical production present an unreasonable risk to health is unsupported by

substantial evidence. TSCA requires EPA to determine whether a chemical substance presents an unreasonable risk under the specific conditions of use, considering each condition of use separately and independently regulating each use. 15 U.S.C. § 2605(b)(4)(A). That requires EPA to evaluate the real world, as the term "conditions of use" means "the circumstances . . . under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." *Id.* § 2602(4).

Although EPA followed a conditions of use approach,[12] it did not actually look at how the substance is used in each condition. Instead, EPA made a series of compounding conservative assumptions that reflect not the actual conditions of use, but a perfect-storm, worst-case world, including flagrant violations of existing OSHA requirements. EPA's risk evaluation is thus fatally flawed because its estimation of risk is not based on substantial evidence. *See Corrosion Proof Fittings*, 947 F.2d at 1213 (EPA is required to base its decision on the entire record, including facts in the record that run counter to decision). EPA assumed that workers never use respirators no matter the level of asbestos fibers present, looked to asbestos-level

---

[12] Although EPA correctly proceeded under the "conditions of use" approach in the relevant risk evaluation here, in a nearly contemporaneous rule issued immediately after the Final Rule, EPA abandoned this approach in favor of a "whole chemical" approach. Procedures for Chemical Risk Evaluation Under TSCA, 89 Fed. Reg. 37,028, 37,035 (May 3, 2024).

readings that reflected the high end of the data only (where 95% of readings were *below* the level EPA examined), assumed 16-year-olds are exposed to asbestos for 40 years, and assumed 3,000 ONUs were exposed to asbestos fibers at dangerous levels without respirators, among other errors described below. EPA applied most of these same assumptions to workers and ONUs in the chemical production industry. Because those assumptions do not comport with the real world, they are not supported by substantial evidence.

> ### A. EPA made incorrect assumptions about the use of PPE in the chlor-alkali industry.

EPA made incorrect assumptions about chlor-alkali workers' use of PPE, particularly respirators. EPA appears to have assumed in its risk evaluation that workers *never* use respirators (or, apparently, any other PPE). According to EPA, it "conduct[ed] baseline assessments of risk and ma[de] its determination of unreasonable risk from a baseline scenario that is not based on an assumption of compliance with OSHA standards, including any applicable exposure limits or requirements for use of respiratory protection or other PPE." 87 Fed. Reg. at 21,713. EPA articulates two main reasons for its assumption: (1) that workers do not always use respirators for some tasks; and (2) that EPA must protect workers not covered by OSHA. Neither makes sense or derives from a conditions of use assessment.

EPA's first reason is logically flawed. As EPA acknowledges, not all asbestos-diaphragm workers are similarly situated. While those involved with certain tasks

45

do not consistently wear respirators, those undertaking the three tasks that have the greatest risk of exposure to asbestos (asbestos unloading and transport, glovebox weighing and asbestos handling, and hydroblasting) wear respirators. Risk Eval. at 236, JA__; 7/13/2022 ACC Comment at 19, 24, JA__, __. But EPA lumps all those workers together and treats them *all* as never using any PPE. This vastly overestimates the risk to that cohort, as some subset indisputably do use respirators consistently. 7/13/2022 ACC Comment at 18, 86 n.25, JA__, __.

What is more, EPA gives no consideration at all to the fact that the other workers use other safety controls in the OSHA regulation, which may not be respirators but nevertheless tremendously reduce risk. The industry at all times complied with the governing regulatory program—the OSHA Asbestos Standard— which does not require respirators when other controls reduce airborne fiber levels below the OSHA PEL. 29 C.F.R. § 1910.1001. In those circumstances, measures such as the engineering and workplace controls described above (including wet methods) can achieve OSHA's safety levels and are used to mitigate risk to workers. *Id*. Indeed, EPA found no unreasonable risk in the NASA Super Guppy condition of use, even though respirators are not required, because of the other engineering and workplace controls. That further undermines EPA's premise that all asbestos-diaphragm workers should be treated as if they have no protection whatsoever.

EPA's second reason is similarly wrong. EPA says it must protect individuals *not* covered by OSHA. 87 Fed. Reg. at 21,713. But EPA's finding of unreasonable risk in the chlor-alkali and chemical-production contexts was limited to workers and ONUs, all of whom are in a workplace and therefore regulated by OSHA. EPA found no risk to customers and bystanders—the only populations *not* covered by OSHA.

## B. EPA improperly based its unreasonable-risk determination on the high-end tendency.

EPA's next worst-case assumption was to base its unreasonable-risk determination on the highest end of the cancer risk data collected. These are called the high-end tendency or 95th percentile values—meaning that 95% of the collected data falls *below* the value. EPA could instead have relied on the central-tendency or 50th percentile value—where half of the data falls above and half below the value. EPA's use of the 95th percentile no more reflects real cancer risk than does a star student's SAT score reflect the norm for the school.

EPA's primary reason for using the 95th percentile is that it is trying to account for what it does not know. Specifically, EPA says that its benchmark accounts only for *cancer* risks, not non-cancer risks such as asbestosis or pleural thickening. Risk Eval. at 236–37, J.A.__. But EPA apparently has not attempted (or does not know how) to quantify these non-cancer risks, so it has simply over-estimated the cancer risk (by using the 95th percentile data). The flaw is clear: if EPA does not know how much risk its benchmark is missing (assuming it is missing anything), EPA cannot

possibly know that skewing its calculations by using the 95th percentile is correct or introduces an even greater error. Blindly putting a thumb on the scales to get a particular result because of a suspicion the scales are out of whack (without any sense of the degree or direction the scales are off) is the epitome of unreasoned decision making.

EPA's second justification for using the 95th percentile is to protect "individuals or subpopulations with greater sensitivity or exposure." Risk Eval. at 230, JA__. TSCA, as amended in 2016, does require EPA to consider unreasonable risk to a "potentially exposed or susceptible subpopulation identified as relevant to the risk evaluation" by EPA. 15 U.S.C. § 2605(b)(4)(A). But EPA does not explain how using the 95th percentile protects against *unreasonable* risk to any such subpopulation, why the central tendency does not suffice to protect against unreasonable risk to that group, or why some number between the 50th and the 95th percentile is not sufficiently protective. TSCA is not and has never been a zero-risk, or even a *reasonable* risk, statute. *Corrosion Proof Fittings*, 947 F.2d at 1215. As a gap-filler, TSCA was and remains a backstop against unreasonable risk. EPA was required to at least explain why the 95th percentile was necessary to that end. It failed to do so.[13]

---

[13] EPA's error here is compounded by a more fundamental error it made upstream of these calculations. EPA was provided full-shift data (data measured against OSHA's eight-hour limit of 0.1 f/cc, averaged over eight hours) and short-

## C. EPA incorrectly assumed 16-year-olds are exposed to asbestos for 40 years.

EPA's third excessively conservative assumption was that 16-year-olds are exposed to asbestos in the chlor-alkali and chemical-production industries, with a 40-year duration of exposure. Risk Eval. at 181, JA__. In support of that assumption, EPA noted that there was no evidence that tasks related to handling asbestos require skills and experience and that the Fair Labor Standards Act of 1938 allows adolescents to work an unrestricted number of hours at age 16. Summary of External Peer Review and Public Comments for Asbestos and Disposition for Asbestos Part 1: Chrysotile Asbestos, EPA-HQ-OPPT-2021-0057-0027, Risk Evaluation RTC at 71–72, JA__.

But this assumption is belied by the record and EPA's own economic analysis. To begin, industry practice requires workers to be at least 18, and the average tenure of workers who handle asbestos is less than 20 years. *Id.* EPA cited no evidence to

_____

term data (data measured against the OSHA excursion limit of 1.0 f/cc averaged over 30 minutes). 7/13/2022 ACC Comment at 20, JA__. EPA combined these two datasets to calculate a "reweighted" exposure estimate for full-shift workers. *Id*. This is not best available science. "Mixing data from different average times makes estimate of variance inaccurate and precludes use of most common statistical tools." *Id*. at 20–21, JA__–__ (quoting Steven D. Jahn et al., A Strategy for Assessing and Managing Occupational Exposures 133 (4th ed. 2015)). EPA's own guidance warns against doing this: "Specific data groupings that usually form like data sets and, as a general rule, should never be pooled into a single data set include . . . . [s]hort term exposure estimates [and] [l]ong term exposure estimates." *Id*. (quoting IT Env't Programs & ICF Kaiser Inc., Guidelines for Statistical Analysis of Occupational Exposure Data at 33 (1994)).

the contrary. Indeed, EPA's own economic analysis, which is based on data from the Bureau of Labor Statistics, sets the age of first exposure at 18 years and finds that the mean exposure duration is 15 years. TSCA Section 6 Final Rule for Asbestos Risk Management, Part 1, EPA-HQ-OPPT-2021-0057-0753 ("Economic Analysis") (March 2024) at 4-23, Table 4-14, JA__.

### D. EPA made incorrect assumptions about ONUs.

Finally, EPA made inaccurate assumptions about the numbers of ONUs and the extent of their exposure to asbestos, both of which skewed the analysis for ONUs. EPA assumed that there are thousands more employees exposed to asbestos, and in far higher concentrations than the evidence supports.

#### 1. EPA incorrectly assumed the number of ONUs.

EPA made inaccurate assumptions about the *number* of ONUs in the chlor-alkali industry. EPA derived its assumption of 2,900 to 3,000 ONUs by subtracting the number of workers from the total number of employees at all chlor-alkali plants. Risk Eval. at 223, JA__. EPA's simplistic formula counts as an ONU even an employee who works in an entirely separate building 1,100 acres away from where asbestos is being handled. *Id.* at 224, JA__. As even EPA recognized, this approach "may overestimate the number of ONUs for asbestos diaphragms." *Id*. In fact, EPA recognized in the Final Rule that the actual number of ONUs is closer to 80. 89 Fed.

Reg. at 21,994. Yet EPA never updated its risk evaluation, which rests on a number orders of magnitude greater than reality.

It was also not appropriate for EPA to classify maintenance staff as ONUs. Because they do not directly work with asbestos, ONUs are assumed not to use any PPE, including respirators, in both the chlor-alkali and chemical-production industries. But maintenance staff are covered by the OSHA Asbestos Standard and must use respirators as designated for the task they are performing. 6/2/2020 ACC Comment at 6, JA__; *see also* 29 C.F.R. § 1910.1001(c) (employer must ensure no employee is exposed above the PEL); 29 C.F.R. § 1910.2(d) (defining "employee" to be "an employee of an employer who is employed in a business of his employer which affects commerce"). So, too, are employees performing janitorial-like activities working in an asbestos-processing area. 7/13/2022 ACC Comment at 26, JA__.

In sum, EPA overestimated the risk to ONUs. It overcounted them, thus overestimating the number of individuals at risk. And it underestimated the amount of protection provided to actual ONUs, thus concluding that they were at unreasonable risk when the protection eliminates that unreasonable risk.

## 2. EPA made incorrect assumptions about the exposure of ONUs.

EPA also assumed far greater exposure of asbestos to ONUs than would occur in reality. For the chlor-alkali industry, EPA hypothesized that there is a chance for

ONUs to "work near or pass through regulated areas." Risk Eval. at 83, JA__. In the chemical-production industry, EPA relied on "bystander" exposure studies during asbestos-containing gasket removal to estimate ONU exposures, emphasizing one study that assumed "bystander" locations of just five and ten feet from the removal activity. *See id.* at 95–96, JA__. EPA did so even though it "found no instances where ONUs are in very close proximity to process areas where asbestos-containing gaskets are removed." *Id.* at 96, JA__. But, more importantly, the OSHA asbestos standards *prohibit* ONUs from entering regulated areas. 29 C.F.R. § 1910.1001(e)(3) ("Access to regulated areas shall be limited to authorized persons or to persons authorized by the [OSH] Act or regulations issued pursuant thereto."); *Id.* § 1910.1001(b) (defining "authorized person" to be "any person authorized by the employer and required by work duties to be present in regulated areas").

EPA's worry about exposure of ONUs in the chlor-alkali industry is also based on literally fictional data about the concentration of asbestos in ambient air. As noted earlier, EPA used air-monitoring data for the potential exposure of ONUs to asbestos. Risk Eval. at 83, JA__. But *all* data samples were "non-detects," meaning they showed no exposure to asbestos. *Id.* Unsatisfied, EPA assumed that even though the instruments showed no asbestos, there really *must* have been asbestos present and the instruments were merely not registering because it was at a level too low for the instrument to detect. *Id.* at 82–83, JA__. EPA translated its assumptions into made-

up numbers that it called "surrogate values." *Id*. at 81, JA__. It took the instruments' "detection limit" (the lowest concentration of asbestos that the method was capable of measuring), divided it by two, and assumed that asbestos was really there at that level. *Id*. For example, if the instrument was only sensitive enough to pick up asbestos at 0.008 f/cc, EPA assumed that a zero reading was really a reading of asbestos at 0.004 f/cc. Needless to say, fictional data are not substantial evidence.[14]

Nor is it "best available science," the standard Congress set for EPA to employ when carrying out its risk evaluation. 15 U.S.C. § 2625(h). At the relevant time, EPA's Risk Evaluation Framework Rule defined "best available science" to be "science that is reliable and unbiased" considering, among other things, whether the procedures used to generate information were "reasonable for and consistent with the intended use of the information." 40 C.F.R. § 702.33 (2017). There is no such fit here. The data on which EPA relied to calculate its surrogate values was generated to measure to OSHA's PEL of 0.1 f/cc, not the two-orders-of-magnitude lower ECEL of 0.005 f/cc. The companies would have set lower levels of detection had they known that the data would be measured against the ECEL, but they did not because the ECEL did not exist at the time.

---

[14] EPA's statements also conflict with its Economic Analysis, where it found: "Chlor-alkali ONU exposure monitoring results were all below detection limits, so it is assumed that their exposures would always be below an ECEL." Economic Analysis at 4–10, JA__.

\* \* \*

In sum, EPA based its risk evaluation on a contrafactual world that assumes no workers wear respirators when handling asbestos, that other safety controls are entirely ineffective, that the highest exposure numbers are typical, that 16-year-olds work with asbestos and do so for 40 years, and that there are thousands of ONUs who are exposed to asbestos without respirators. EPA's risk evaluation was based on fiction, not substantial evidence, and should be vacated. And that should be the end of the analysis, as the risk-management portion of the Final Rule cannot stand if the risk evaluation has been vacated.

## II. EPA violated TSCA section 9 by failing to refer its findings to OSHA.

Even if there was any unreasonable risk from asbestos diaphragms in the chlor-alkali industry or asbestos-containing sheet gaskets in chemical production (and there was not), EPA was required under TSCA section 9 to submit a report to OSHA and wait for a response before taking any regulatory action. Section 9(a) requires EPA to send a report to another agency when an unreasonable risk from a condition of use "may be prevented or reduced to a sufficient extent" by action under a federal law that EPA does not administer. 15 U.S.C. § 2608(a)(1). If EPA does so, it may not proceed with the rulemaking unless the other agency fails to respond or initiate action to protect against the unreasonable risk. *Id*. § 2608(a)(2) & (a)(3).

Although EPA has discretion in assessing whether such a law exists, there is no question here that the OSH Act qualifies. 29 U.S.C. § 654. EPA itself has described the OSH Act as the "primary statute for protecting the health and safety of workers" and provides "broad authority to regulate chemical risks in the workplace." 1,3-Butadiene; Decision to Report to the Occupational Safety and Health Administration, 50 Fed. Reg. 41,393, 41,398 (Oct. 10, 1985).[15] And the fact is that OSHA has invoked its authority under the OSH Act to regulate the very risk at issue here: that of chrysotile asbestos on workers in the chlor-alkali and chemical-production industries. 29 C.F.R. § 1910.1001.

To escape its obligation, EPA answers a different question of its own making. EPA explains that it can address the risks "in a more coordinated, efficient and effective manner under TSCA." 89 Fed. Reg. at 21,999. But that is not what the statute requires. The question under the statute is about what *other* agencies and laws cover.

The regulations must be vacated and remanded because EPA failed to adequately explain its decision to bypass OSHA and the OSH Act.

---

[15] *See also* 4,4'-Methylenedianiline; Decision To Report to the Occupational Safety and Health Administration, 50 Fed. Reg. 27,674, 27,680 (July 5, 1985) ("The OSH Act is the primary statute for protecting the health and safety of workers, and, as such, provides OSHA with broad authority to regulate chemical risks in the workplace.").

## A. The OSH Act is "a Federal law not administered by" EPA that "may" prevent or reduce the unreasonable risk that EPA identified.

TSCA section 9(a)(1) affords EPA a modicum of discretion over the decision to refer a risk to another agency, but that discretion is sharply limited. The *only* discretion EPA has is to determine whether the unreasonable risk of injury to health or the environment from a condition of use "may be prevented or reduced to a sufficient extent by action taken" under a federal law EPA does not administer. 15 U.S.C. § 2608(a)(1). If that is satisfied—that is, if that other law "*may*" prevent or reduce such risk—EPA has no discretion and must defer in the first instance to that other agency. *Id.*; *see Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024) (court has duty to ensure that agency has engaged in reasoned decision making within boundaries set by Congress).

This is a *very* low bar. Congress did not say "would" or even "may likely." The word "may" in this context means "[t]o be a possibility." May, Black's Law Dictionary (12th ed. 2024); *Jalbert as Tr. of the F2 Liquidating Tr. v. Zurich Servs. Corp.*, 953 F.3d 143, 152 (1st Cir. 2020); *United States v. Anderson Seafoods, Inc.*, 622 F.2d 157, 159 (5th Cir. 1980) (phrase "may render" requires reasonable possibility). So if there is any reasonable possibility that action taken under the OSH Act will prevent or reduce the unreasonable risk "to a sufficient extent," EPA was required to follow the Section 9(a)(1) procedures.

There is no serious question that, as a matter of law, such a reasonable possibility exists. Through the OSH Act, Congress required every employer to "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1). Congress also required every employer to "comply with occupational safety and health standards promulgated under this chapter." 29 U.S.C. § 654(a)(2). And as described above, OSHA has already invoked this statutory authority to regulate the exact risk that EPA seeks to regulate here. 29 C.F.R. § 1910.1001. OSHA has set a PEL, the concentration of airborne asbestos fibers to which no employee can be exposed. OSHA certainly *could* seek to strengthen or augment its current regulations to cover whatever risk EPA believes has not been addressed.

Nor is there any basis to suggest EPA's exercise of its narrow discretion is somehow unreviewable. The Supreme Court applies "a strong presumption favoring judicial review of administrative action." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quoting *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 489 (2015)). For this reason, while some statutes commit matters to agency discretion, the Court reads this "quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'"

*Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (quoting *Weyerhaeuser Co.*, 586 U. S. at 23). Those "rare circumstances" are categories of administrative decisions traditionally regarded as committed to agency discretion, such as a decision not to institute enforcement proceedings and a decision by a national-security agency to terminate an employee in the interest of national security. *Id*. This case is quite different. TSCA section 9(a) cabins EPA's discretion by stating the precise circumstances calling for referral to another agency—when unreasonable risk "may be prevented or reduced to a sufficient extent by action taken under a Federal law not administered by [EPA]." 15 U.S.C. § 2608(a)(1). Congress explicitly provided a "meaningful standard against which to judge" EPA's exercise of discretion under TSCA section 9(a). *Dep't of Com.*, 588 U.S. at 772.

Properly following TSCA's procedures would also not have resulted in unreasonable risk going unaddressed. TSCA section 9 requires OSHA to act timely in response to a referral. *See* 15 U.S.C. §§ 2608(a)(2), (a)(3), & (a)(4). If OSHA does not comply with the timeframes in responding to EPA's referral, EPA may proceed with its risk-management rulemaking. *Id*.

### B. EPA's reasons for not making the referral misapply the section 9(a) standard.

EPA's main response regarding section 9(a) is its determination that it "is better positioned to mitigate the unreasonable risks from chemical substances through TSCA section 6 rather than relying on regulations adopted under OSHA."

58

2021 Part 1, Proposed Rule, EPA–HQ–OPPT–2021–0057 (Mar. 2024) ("Final Rule RTC") at 166, JA__. According to EPA, the risks from chrysotile asbestos "can be addressed in a more coordinated, efficient and effective manner under TSCA." 89 Fed. Reg. at 21,999. This misapplies section 9 for two reasons.

### 1. EPA gets the standard wrong.

To start, EPA applies the wrong standard. Congress directed EPA to assess only what *other* laws implemented by *other* agencies may accomplish through regulation and to measure that against TSCA's standard of unreasonable risk. So the question is what *OSHA* "may" do. Instead, EPA performed a self-assessment, asking whether *it* could do the job "better" or more efficiently.

This mistake is illustrated starkly by EPA's assertion that "[w]ith the exception of TSCA, there is no Federal law that provides authority to prevent or sufficiently reduce these cross-cutting exposures. No other Federal regulatory agency can evaluate and address the totality of the risk that EPA is addressing in this rule." *Id.* This not only the exact *opposite* question, but it proves too much. EPA's broad conception of its own power under TSCA to address the "totality of the risk" would always outpace other agencies that Congress has given more narrow focus and would provide a false justification to forgo a section 9(a) referral every time. *Id.* This interpretation is a far cry from the harmonization that Congress envisioned and

would lead instead to the takeover by EPA of primary authority to regulate all chemical risks.

### 2. EPA's assessment of OSHA is incorrect.

To the extent EPA does address OSHA, it is wrong in every respect. First, EPA says that it refused to invoke section 9(a)(1) and report to OSHA because OSHA can only regulate the workplace. 89 Fed. Reg. at 21,999. Regulation by OSHA would, in EPA's view, leave exposed users who encounter asbestos *outside* the workplace, such as consumer users, some state and local employees, university students, volunteers, and the self-employed. *Id*.

But while that might be a problem for some other conditions of use, it is not an issue in the chlor-alkali context or chemical-production contexts. None of these other users encounters chrysotile asbestos from the chlor-alkali or sheet gasket condition of use, because that use *is limited to the workplace*. Risk Eval. at 234–47, JA__; *see also* 89 Fed. Reg. at 21,994 (describing number of those exposed to chrysotile asbestos from diaphragms as "80 workers and 80 [occupational non-users]" and from sheet gasket use (non-nuclear) as "at least 18 workers and 119 ONUs"). That is why EPA identified no risk for the chlor-alkali or sheet gasket condition of use aside from the workplace. Risk Eval. at 243, JA__.

OSHA may very well lack authority to regulate the risk EPA identified from other conditions of use, as they arise outside the workplace. But that has no bearing

on whether EPA should have invoked section 9(a) as to the chlor-alkali and sheet gasket condition of use—which occur exclusively in the workplace.

Second, EPA says that the OSH Act sets a different standard—has different "finding requirements." 89 Fed. Reg. at 21,999. According to EPA, "[g]aps" exist between OSHA's authority and TSCA because, to set a PEL, OSHA must establish that the new standard is economically and technically feasible. *Id*. But EPA is simply assuming that, because the OSH Act has different factors and considerations, it cannot *possibly* mitigate unreasonable risk to a sufficient extent. The agency offers no analysis to back up this assertion. It does not even attempt to explain how cost and practicability factors in setting a risk-management rule under TSCA's section 6 differ materially from the considerations applied under the OSH Act. *See* 15 U.S.C. § 2605(c)(2) (requiring consideration of economic consequences and likely effect of rule on economy and technological innovation). Nor could it have, given the low bar set by TSCA section 9(a)(1), which only asks whether the other law "*may*" prevent or reduce the risk identified by EPA.

EPA also made several throw-away comments suggesting that it does not think OSHA is doing its job. 87 Fed. Reg. at 21,712. According to EPA, OSHA's PEL is outdated and the scientific evidence suggests that the PEL is not sufficiently protective. *Id*. Once again, this is not the governing standard. The question is whether OSHA "may" use its regulatory authority to prevent or reduce to a sufficient extent

the unreasonable risk that EPA identified in its risk evaluation from the chlor-alkali or sheet gasket condition of use. 15 U.S.C. § 2608(a)(1). Reporting to OSHA under section 9(a) would have enabled that agency to determine whether to "initiate[] . . . action under the law (or laws) administered by [OSHA] to protect against such risk associated with such activity or combination of activities." *Id*. § 2608(a)(2)(B). The report to OSHA is about potentially taking *further* action. EPA itself has recognized this in the past, when it submitted reports to OSHA for other chemicals: "OSHA has experience and expertise in enacting and enforcing these types of regulations."[16] Due to EPA's failure to comply with section 9(a), OSHA never got that chance here.

### III. The Final Rule for asbestos diaphragms in the chlor-alkali industry and sheet gaskets in chemical production exceeds EPA's authority under TSCA section 6.

TSCA section 6(a) imposes two important limits that EPA violated, even assuming it correctly refused to refer the issue to OSHA for its evaluation in the first instance. First, section 6(a) authorizes EPA to regulate only "to the extent necessary" to ensure a chemical substance no longer presents unreasonable risk under the conditions of use. Second, Congress required EPA to consider at least one primary regulatory alternative. EPA violated both of these principles: the Final Rule goes

---

[16] 4,4'-Methylenedianiline; Decision to Report to the Occupational Safety and Health Administration, 50 Fed. Reg. at 27,680; *see also* 1,3-Butadiene; Decision to Report to the Occupational Safety and Health Administration, 50 Fed. Reg. 41,393.

beyond the extent necessary to eliminate unreasonable risk (assuming there is such risk), and EPA failed to consider any real regulatory alternative.

### A. The Final Rule violates section 6 by imposing measures beyond "the extent necessary" to eliminate unreasonable risk.

Even if there is any unreasonable risk from diaphragms in the chlor-alkali industry or sheet gaskets in chemical production, the Final Rule goes far beyond what is necessary to eliminate it. EPA itself says that compliance with the ECEL and workplace controls can eliminate unreasonable risk, and imposed these measures for up to 12 years at some facilities. 89 Fed. Reg. at 21,988. If EPA is correct that these measures eliminate unreasonable risk, EPA can go no further, as these measures regulate therefore "to the extent necessary." Because EPA goes further and imposes a ban, EPA exceeded its authority under section 6(a).

#### 1. TSCA section 6(a) requires EPA to limit its risk-management rule to what is necessary to eliminate unreasonable risk.

Section 6(a) provides that if EPA makes a finding of unreasonable risk, it must "apply one or more of the following requirements to such substance or mixture *to the extent necessary* so that the chemical substance or mixture no longer presents such risk." 15 U.S.C. § 2605(a) (emphasis added). The ordinary or natural meaning of those words controls. *HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 388 (2021) ("Where Congress does not furnish a definition of

its own, we generally seek to afford a statutory term 'its ordinary or natural meaning.'"). To determine that meaning, courts consult dictionaries, *see, e.g.*, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 676 (2020); *Babb v. Wilkie*, 589 US. 399, 405 (2020), and "conventional rules of grammar," *Facebook, Inc. v. Duguid*, 592 U.S. 395, 402 (2021). Further, this Court "must exercise independent judgment" in determining the "single, best meaning" of the statute. *Loper Bright Enters.*, 144 S. Ct. at 2262, 2266.

The single, best reading of Section 6(a) is that EPA must choose the regulation that is sufficient to eliminate the identified unreasonable risk, but no more. At the time of TSCA's enactment, "extent" was defined as "the point or degree to which something extends," and "necessary" was defined as "whatever is essential for some purpose." Webster's Third New International Dictionary 1510 (1986); *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 647 (9th Cir. 2004) (Forest Service could regulate "no more than was necessary to achieve" statutory goals where statute limited authority to act "to the extent necessary). "Such risk" clearly means the "unreasonable risk of injury to health or the environment" in the first part of the sentence. Together, the plain text shows that EPA is not free to eliminate *all* risk, but only *unreasonable* risk, and then only to the extent necessary to render the risk no longer unreasonable.

The context of TSCA supports this reading. EPA must base its initial risk-evaluation determination on unreasonable risk and not just any risk. 15 U.S.C. § 2605(b)(4)(A). Also, EPA must consider the costs and benefits and economic consequences of its risk-management rules. *Id.* § 2605(c)(2)(A). Had Congress intended EPA to go as far as possible to eliminate all risk, it would have adopted a purely hazard-based standard and would not have required EPA to consider the costs and economic consequences of its regulation.

Legislative history points in the same direction. As noted, Congress removed a "least burdensome" requirement from section 6(a) in 2016. It did so because of the "evidentiary and analytic burdens associated with justifying that each proposed regulatory action was the least burdensome requirement needed to ensure a chemical did not pose an unreasonable risk." S. Rep. No. 114-67, at 18–19 (2015). But Congress not only *retained* the requirement that EPA regulate only "to the extent necessary" to eliminate unreasonable risk, it also *reinforced* that requirement by granting EPA more regulatory options. 130 Stat. 448. Specifically, Congress amended sections 6(a)(1) and 6(a)(2) to make clear EPA had authority not only to "prohibit[]" but also to "otherwise restrict[]" manufacturing of a substance. *Id*. In other words, Congress encouraged more nuance—beyond an across-the-board ban on a substance—to carry out its statutory charge to regulate only "to the extent necessary." Together, this history confirms that Congress intended to limit regulation

to just what is necessary, while "ensur[ing] that the competitive advantage of the U.S. chemical industry is not eroded by regulatory mandates." S. Rep. No. 114-67, at 2.

### 2. EPA offers unpersuasive reasons that the ECEL and enhanced workplace controls do not suffice as permanent measures.

EPA offers a handful of unpersuasive reasons that compliance with the ECEL, together with other workplace controls, is sufficient only temporarily.

First, EPA says that monitoring to and below the ECEL "may at times . . . be problematic," and "[t]herefore, owners or operators may be unable to reliably ensure with sufficient confidence that workers are not exposed to air concentrations above the ECEL." *Id.* EPA further explains that the "problem[s]" are "analytical and field sampling challenges." *Id*. But EPA admits that monitoring to or below the ECEL is "achievable" and "feasibl[e]." *Id*. & 21,988. And the question is whether the ECEL and workplace controls *can* eliminate unreasonable risk, not whether it is difficult to do so. EPA itself has imposed compliance with the ECEL as a sufficient control measure for five to 12 years (depending on the technology). Its attempt to have it both ways is simply unpersuasive—and self-contradictory.

Next, EPA claims that the ECEL cannot eliminate unreasonable risk because monitoring data that the industry provided during the risk evaluation showed air concentrations of asbestos above the ECEL. Final Rule RTC at 5, JA__. EPA is

comparing apples to oranges. That data was gathered to show compliance with OSHA's PEL at time when the ECEL did not even exist. It says nothing about ability to comply with the ECEL.

EPA then says that a ban is necessary because compliance with the ECEL will lead to employers relying on respirators, what EPA calls "the least-effective means of ensuring worker protection in the hierarchy of controls." 89 Fed. Reg. at 21,982. But EPA has already determined that respirators eliminate unreasonable risk in the chlor-alkali industry. And there is nothing inconsistent about a measure being the "least effective" when used on its own and nevertheless effective to eliminate unreasonable risk. Both can be true. In fact, OSHA specifically includes respirators (and PPE more generally) as an essential tool for addressing workplace risk. 29 C.F.R. § 1910.1001(g).

Finally, EPA contends that respirators and other PPE are not practical for ONUs, because these employees do not directly work with asbestos. EPA does not explain why *unreasonable* risk to ONUs (which, again, is based on fictional data that rests on readings showing *no* asbestos) cannot be eliminated through *other* workplace controls, such as additional measures to keep them out of a hazard zone. EPA's assumption that some ONUs will "pass through" or "work near" regulated areas (Risk Eval. at 83, JA___; 89 Fed. Reg. at 21,982–83) without PPE is unfounded. Any employee exposed to asbestos levels above the PEL *must* use PPE, and only

authorized persons may enter regulated areas. 6/2/2020 ACC Comment at 6, JA__;
*see also* 29 C.F.R. § 1910.1001(e)(3).

* * *

The ECEL, with workplace controls that include respirators, can eliminate unreasonable risk. That is why EPA itself has imposed it as the measure for use during the years-long phase-out period. EPA's rejection of these measures in favor of a ban is simply a naked effort to eliminate *all* risk in the chlor-alkali and chemical-production industries. That is in excess of EPA's authority because TSCA permits EPA only to eliminate *unreasonable* risk, and then only "to the extent necessary."

### B. EPA did not consider any real alternative regulatory action.

TSCA section 6 further requires EPA to consider, in addition to its proposed action, "[one] or more primary alternative regulatory actions." 15 U.S.C. § 2605(c)(2)(A)(iv)(II). EPA did not do this. Instead, it considered only one regulatory action—a *ban* on asbestos in the chlor-alkali and chemical-production industries, under two different compliance dates. Failure to consider an alternative other than a ban is insufficient to satisfy its statutory requirement. *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 797 (D.C. Cir. 1984) (agency must meaningfully examine alternatives).

EPA's "alternatives" are basically the same: a ban. Under the first, the ban on use of asbestos diaphragms in the chlor-alkali industry would take effect after five

68

years. Under the other alternative, the ban would take effect after 12 years. 89 Fed. Reg. at 21,996.

These are not alternative regulatory actions as contemplated by TSCA. TSCA section 6(a) lists seven types of regulatory actions that EPA can impose either alone or in combination. 15 U.S.C. § 2605(a). Section 6(d) then separately provides that EPA must specify the date on which the regulatory action will take effect, which must be "as soon as practicable, but not later than 5 years" except in the case of a ban or phase-out, in which case the ban or phase-out must begin no later than five years after promulgation of the rule. *Id.* § 2605(d). TSCA thus makes clear that the date when a ban or phase-out begins is the *effective date* of the action, not the alternative regulatory action itself.

EPA's approach of considering only different effective dates for its ban, not different alternative regulatory actions, stands in contrast to EPA's 1989 asbestos regulation. 54 Fed. Reg. 29,460. In that rulemaking, EPA considered a staged ban (the alternative selected in the final rule), a permit system that would phase down use of asbestos, an immediate ban, and a requirement of labeling asbestos-containing products. *Id.* at 29,487–89.

To meet its obligation here, EPA should have considered other measures to comply with the ECEL such as PPE, certification and training, and other workplace controls. EPA attempts to justify its failure to do so by saying that it would not

propose an alternative regulatory option that it could not determine would eliminate unreasonable risk. Final Rule RTC at 50, JA__. This contradicts its own risk-evaluation determination which, as noted above, found that PPE if used *could* eliminate unreasonable risk. In addition, EPA found that certification and training and other control methods eliminated unreasonable risk for the NASA Super Guppy. At a minimum, EPA should have conducted a proper analysis of whether such measures could eliminate unreasonable risk for diaphragms and sheet gaskets.

## IV. EPA's setting of different compliance deadlines is unlawful.[17]

EPA required different chlor-alkali companies to comply with the Final Rule according to different deadlines. 89 Fed. Reg. at 21,985. That is unlawful for two main reasons. *First*, TSCA section 6(d)(2), the provision permitting the setting of different compliance deadlines for "affected persons," is an unconstitutional standardless delegation of legislative authority. *Second*, EPA's explanation for its different treatment fails the substantial evidence standard.

### A. TSCA section 6(d)(2) is an unconstitutional delegation of legislative authority.

TSCA section 6(d)(2) provides, in total, as follows: "As determined by [EPA], the compliance dates established under [section 6(d)(1)] may vary for different affected persons." 15 U.S.C. § 2605(d)(1). This is an unconstitutional delegation of

---

[17] As noted, Industry Associations do not join this argument. *Supra* at 2, n.2.

legislative authority because it articulates no intelligible principle to guide EPA's discretion.

Congress cannot delegate legislative power to another entity. *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022), *aff'd on other grounds*, 144 S. Ct. 2117 (2024). "Congress may grant regulatory power to another entity only if it provides an 'intelligible principle' by which the recipient of the power can exercise it." *Id*. The two questions that the Court must address to determine whether Congress has impermissibly delegated a legislative power are "(1) whether Congress has delegated power to the agency that would be legislative power but-for an intelligible principle to guide its use and, if it has, (2) whether it has provided an intelligible principle such that the agency exercises only executive power."

There can be no question that TSCA section 6(d)(2) is a delegation of legislative power. A power is legislative if it has "the purpose and effect of altering the legal rights, duties and relations of persons . . . outside the legislative branch." *Id*. (quoting *INS v. Chadha*, 462 U.S. 919, 952 (1983)). Congress granted EPA the ability to "alter[] the legal rights, duties and relations of persons," i.e., the chlor-alkali companies. The delegation must fail unless Congress also provided an intelligible principle to guide EPA's discretion. There is none.

In *Jarkesy*, this Court held that Congress had unconstitutionally delegated legislative power by giving the SEC the "unfettered authority" to decide whether to

bring enforcement actions in Article III courts or within the agency itself. *Id*. at 459.

Congress provided no intelligible principle to make that decision, saying "nothing at all indicating how the SEC should make that call in any given case." *Id*. at 462. This "total absence of guidance is impermissible under the Constitution."[18] *Id*. (citing *Gundy v. United States*, 588 U.S. 128, 136 (2019) (Kagan, J.)); *see also Consumers' Rsch. v. FCC*, 109 F.4th 743, 756 (5th Cir. 2024) (en banc) (stating that Congress might have unconstitutionally delegated power to FCC to impose universal service fee, but deciding case on other grounds).

The same result should obtain here. TSCA section 6(d)(2) provides not a word of guidance, much less an intelligible principle, when EPA should exercise its discretion and treat affected persons differently. This is a simple, unfettered delegation to EPA of the legislative authority to target particular persons with onerous deadlines and grant more generous time to others, at the whim of EPA. "[A] total absence of guidance is impermissible under the Constitution." *Jarkesy*, 34 F.4th at 462.

**B.  EPA's differential treatment of companies in the chlor-alkali industry does not comply with the statute.**

Even if section 6(d)(2) is constitutional because it provides sufficient guidance, EPA's differential treatment does not satisfy the substantial evidence

---

[18] The Supreme Court affirmed this Court's judgment, though on different grounds. *Jarkesy*, 144 S. Ct. 2117.

standard. EPA set different compliance deadlines for different chlor-alkali companies based on whether the asbestos diaphragms are being replaced by non-asbestos diaphragms or non-asbestos membrane technology. 89 Fed. Reg. at 21,980. Facilities (such as Olin's) that are converting to non-asbestos diaphragms have five years from the effective date to comply, while those converting to non-asbestos membrane technology (Olin's competitors) have up to 12 years. *Id.* at 22,006–07.

EPA's reasoning for the differential treatment considers a factor not included in the statute. The only arguable guidance under TSCA section 6(d) for setting the effective date is when compliance is "practicable." 15 U.S.C. § 2605(d)(1). But EPA considered energy usage and the supposedly better product that membrane technology produces. EPA relied on its determination that membrane technology "uses less energy and produces a higher-quality product (containing less salt) for which there is greater market demand." 89 Fed. Reg. at 21,980; *see also id.* at 21,971, 21,972, 21,995, 21,996 (extolling supposed benefits and superiority of membrane technology over non-asbestos diaphragms); *id.* at 21,996 (criticizing chlor-alkali industry as "one of the most energy-intensive industrial operations"). EPA's transparent intent was to encourage the industry to switch to the most energy-efficient alternative (membranes), to "reduce[] overall electricity consumption and thus the total level of pollutants associated with electric power generation, including carbon dioxide, particulate matter, sulfur dioxide, and nitrogen oxides." *Id.* at

21,997. These considerations, however, have nothing to do with whether the compliance deadline is "as soon as practicable."

EPA says that it takes longer to convert to membrane technology than it does to convert to non-asbestos diaphragms. *Id.* at 21,980. But EPA ignores the competitive disadvantage to companies like Olin Corporation. Congress required that the compliance date be "as soon as practicable," not "as soon as possible." The word "practicable" imports an element of reasonableness, and the statute thus requires that the deadlines be within a reasonable period of time. *Mississippi v. Richardson*, 622 F.2d 1203, 1206–07 (5th Cir. 1987) ("The phrase 'as soon as practicable' means 'within a reasonable time under all the circumstances to effectuate the objects and purposes of the notice clause.'"); *Callaway v. Cent. Sur. & Ins. Corp.*, 107 F.2d 761, 762 (5th Cir. 1939) ("notice as soon as practicable meant notice within a reasonable time"). It is unreasonable to disadvantage some companies simply because they have decided to transition to a technology that EPA apparently does not favor. This is especially true where, as EPA has found, all workers are protected against unreasonable risk by the ECEL.[19]

---

[19] Consistent with Olin's comments to EPA, Olin requires seven years from the promulgation of the Final Rule to transition all of its asbestos diaphragms to non-asbestos diaphragms. Olin Comments (Apr. 4, 2023), JA__.

# CONCLUSION

For the foregoing reasons, the petitions should be granted and the Rule vacated.

Dated: September 30, 2024     Respectfully submitted,

            /s/ Elbert Lin
            Elbert Lin
            *Counsel of Record*
            Hunton Andrews Kurth LLP
            951 East Byrd Street, East Tower
            Richmond, VA 23219
            (804) 788-8200
            elin@HuntonAK.com

            Matthew Z. Leopold
            Erica N. Peterson
            Hunton Andrews Kurth LLP
            2200 Pennsylvania Avenue, NW
            Washington, DC 20037
            (202) 955-1500
            mleopold@HuntonAK.com
            epeterson@HuntonAK.com

            Nicholas D. Stellakis
            Hunton Andrews Kurth LLP
            60 State Street, Suite 2400
            Boston, MA 02109
            (617) 648-2800
            nstellakis@HuntonAK.com

            *Counsel for Petitioner Olin*
            *Corporation*

Robert J. Karl, Esq.
Eric B. Gallon
Porter, Wright, Morris & Arthur, L.L.P.
41 S. High Street, Suite 3000
Columbus, OH 43215
(614) 227-1925
rkarl@porterwright.com
egallon@porterwright.com

*Counsel for Petitioner Ohio Chemistry
Technology Council*

David Y. Chung
Warren Lehrenbaum
Crowell & Moring LLP
1001 Pennsylvania Ave., N.W.
Washington, DC 20004
(202) 624-2500
(202) 628-5116 (fax)
dchung@crowell.com

*Counsel for Petitioner American
Chemistry Council, Georgia Chemistry
Council, and Texas Chemistry Council*

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(f) and (g), I certify that this Opening Brief of Industry Petitioners complies with this Court's August 7, 2024, Scheduling Order, because it contains 17,151 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Times New Roman font using Microsoft Word.

/s/ Elbert Lin